La Facultad para las Ciencias Sociales Aplicadas, Inc., demandante y apelada, *v.* Consejo de Educación Superior, demandado, y El Secretario de Justicia del Estado Libre Asociado de Puerto Rico, apelante.

*Números:* AC-90-100
CE-90-103

*Resueltos:* 2 de junio de 1993

522

*Jorge Pérez Díaz, Procurador General,* y *Carlos Lugo Fiol, Procurador General Auxiliar,* abogados de El Pueblo, apelante; *José R. Pérez Anzalota,* abogado de la apelada; *Marvin Díaz Ferrer,* abogado del Consejo de Educación Superior.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Tenemos ante nos dos recursos que han sido consolidados. Por un lado comparece el Consejo de Educación Superior (en adelante Consejo) para solicitar la revisión de la sentencia emitida el 28 de diciembre de 1989 por el Tribunal Superior, Sala de Guayama, que revoca la decisión administrativa del Consejo mediante la cual se le denegó a la Facultad para las Ciencias Sociales Aplicadas, Inc. (en adelante la Facultad, Inc.) la renovación de su licencia para ofrecer un programa de Maestría en Artes con concentración en Psicología Clínica. Por otra parte, también comparece el Secretario de Justicia del Estado Libre Asociado de Puerto Rico, que apela la determinación de ese mismo tribunal que declaró inconstitucionales las Leyes Núm. 1 de 20 de enero de 1966, según enmendada, 18 L.P.R.A. sec. 601 *et seq.,* y Núm. 31 de 10 de mayo de 1976, según enmendada, 18 L.P.R.A. sec. 2101 *et seq.* Ambas disposiciones confieren al Consejo el gobierno del sistema uni-

versitario público, a la vez que le asignan la responsabilidad de otorgar o denegar licencias a las instituciones privadas de educación superior.

I

De los documentos que obran en el récord y de la sentencia emitida por el tribunal de instancia surgen los acontecimientos esenciales que dieron lugar a estos recursos.

La Facultad, Inc. era una institución privada de educación superior organizada en 1976 como una corporación sin fines de lucro bajo las leyes del Estado Libre Asociado de Puerto Rico y con oficinas principales localizadas en el Municipio de Cayey.[1] Dicha institución sólo ofrecía un programa de estudios conducentes a una Maestría en Artes con concentración en Psicología Clínica.

En diciembre de 1978, el Consejo otorgó a la Facultad, Inc. una licencia de autorización para operar como institución educativa de educación superior por un término de cuatro (4) años.

El 28 de diciembre de 1981 la Facultad, Inc. presentó ante el Consejo una solicitud de *renovación* de licencia para continuar con sus operaciones. Poco después, funcionarios de la Oficina de Licencia y Acreditación del Consejo les ofrecieron a los directivos de la institución una orientación en cuanto al proceso que ha de seguirse para obtener la renovación solicitada, notificándoles las normas reglamentarias de acreditación vigentes y las guías de referencia que utilizaría la Junta Consultiva[2] (en adelante

---

[1] En la actualidad dicha institución no existe.

[2] La Junta Consultiva (en adelante la Junta) se crea por mandato de la Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601 *et seq.*) según enmendada por el Art. 3(g)(3) de la Ley Núm. 27 de 11 de julio de 1978.(18 L.P.R.A. sec. 602(g)(3)). Esta Junta la integra el Secretario de Instrucción Pública o su representante y los educadores seleccionados de entre los miembros de instituciones privadas de educación universitaria existentes en Puerto Rico, debidamente acreditadas, y de la Universidad de Puerto Rico. El Consejo de Educación

la Junta), que por designación del Consejo tendría a su cargo la evaluación de las operaciones de la Facultad, Inc. Véanse: 18 L.P.R.A. sec. 602(g)(1) y(3), y 18 L.P.R.A. sec. 2102.

El 28 de junio de 1982, la Facultad, Inc.[3] sometió a la Oficina de Licencia y Acreditación del Consejo el *Informe de Autoevaluación* requerido por el Reglamento para la Otorgación de Licencias a Instituciones Privadas de Educación Postsecundaria, Departamento de Instrucción Pública, 9 de junio de 1977.[4] En conformidad con dicho reglamento y con la Ley de la Universidad de Puerto Rico, el Consejo designó la Junta antes aludida, que quedó finalmente integrada por un profesor del Departamento de Psiquiatría del Recinto de Ciencias Médicas de la Universidad de Puerto Rico; un profesor de la Facultad de Pedagogía del Recinto de Río Piedras de la Universidad de Puerto Rico; un bibliotecario de la Universidad Interamericana; un profesor de la Facultad de Administración Comercial de la Universidad Católica, y el director del Programa de Estudios Sociales del Departamento de Instrucción Pública. La Junta procedió entonces a visitar las facilidades de la Facultad, Inc. los días 30 de septiembre, 1ro y 2 de octubre de 1982. A raíz de la visita, la Junta sometió su Informe de Hallazgos en cuanto a las operaciones de la institución el 16 de noviembre de 1982. En dicho informe se señalaba una serie de deficiencias de la Facultad, Inc. y se recomendaba la denegación de la solicitud de renovación.

El 13 de enero de 1983 la Facultad, Inc. sometió al Consejo su reacción al aludido *Informe de Hallazgos*, cuestio-

---

Superior (en adelante Consejo), al determinar la composición de la Junta, toma en consideración la naturaleza y complejidad de la institución que ha de ser acreditada. Se excluye de la Junta a los miembros que correspondan a la institución sujeta a evaluación. Reglamento sobre Acreditación de Instituciones Privadas de Educación Superior en Puerto Rico, Departamento de Instrucción Pública, 15 de septiembre de 1967, Arts. 4–6.

[3] Véase el *Informe de Hallazgos* de 16 de noviembre de 1982. Apéndice, págs. 27–29.

[4] Versión aprobada por el Consejo de Educación Superior el 9 de junio de 1977.

nando los fundamentos de las deficiencias que había seña-
lado la Junta. Dicho escrito de reacción fue examinado por
la Junta, la cual tomando en cuenta toda la evaluación
realizada, preparó y sometió al Consejo su Informe Final y
Recomendaciones el 10 de febrero de 1983,[5] recomen-
dando que no le fuera renovada la licencia a la Facultad,
Inc.

El Consejo, luego de haber evaluado el expediente admi-
nistrativo, acogió la recomendación de la Junta, hizo el In-
forme Final y Recomendaciones parte de su Resolución y,
el 11 de febrero de 1983, negó formalmente la licencia de
renovación solicitada. En cumplimiento de su obligación
reglamentaria, dio publicación a un aviso en la prensa del
país en el que informaba la decisión tomada.

La Facultad, Inc., por su parte, solicitó una vista admi-
nistrativa el 28 de marzo de 1983 supuestamente para re-
futar las deficiencias señaladas por el Consejo al denegarle
la licencia. En esa vista, celebrada el 20 de abril de 1983, y
en otras celebradas posteriormente, la Facultad, Inc. es-
tuvo representada por un abogado y ofreció prueba supues-
tamente en apoyo de su solicitud de reconsideración. Sin
embargo, surge de la transcripción de la vista de 2 de junio
de 1983[6] que durante el transcurso de ésta la *Facultad,
Inc. no sólo reconoció y admitió en general la validez de los
señalamientos del Consejo, sino que también se comprome-
tió a realizar los cambios y las modificaciones necesarios
para ajustarse a sus recomendaciones.*

Después de conducida la vista, la representación legal
de la Facultad, Inc. envió una carta al Presidente del Con-
sejo, fechada el 15 de junio de 1983, para solicitar que no
diera por terminada la vista de reconsideración de 2 de
junio de 1983, y que le concediera cuarenta y cinco días
para presentar evidencia de que la apelada había comen-
zado a implantar el plan que había trazado *"para adoptar*

---

[5] Véase el expediente administrativo, Apéndice, pág. 146.

[6] Véase el expediente administrativo, Apéndice, pág. 381 y 483.

*las medidas necesarias dirigidas a corregir las deficiencias que la Junta Consultiva señaló en su informe*".([7]) No obstante, no fue sino hasta el 10 de febrero de 1984, ocho meses con ocho días después desde la última vista administrativa de 2 de junio de 1983, y después de varias prórrogas, cuando la Facultad, Inc. finalmente envió al Presidente del Consejo un documento titulado Informe de Progreso.([8])

El Consejo consideró dicho informe a la luz de los señalamientos hechos por la Junta y, en reunión de 29 de febrero de 1984, acordó dar por terminada la vista administrativa y se reafirmó en su decisión original de no conceder la Licencia de Renovación a la Facultad, Inc.([9])

De dicha decisión la Facultad, Inc. solicitó reconsideración, que fue denegada por el Consejo el 31 de mayo de 1984.

El 2 de julio de 1985 la Facultad, Inc. presentó una solicitud de revisión ante el Tribunal Superior, alegando la comisión de cinco errores por parte del Consejo:

1) la aceptación de la recomendación de la Junta cuando ésta no estaba basada en los criterios expuestos en la ley y en los reglamentos aplicables;

2) al descartar la prueba que refutaba las alegadas deficiencias señaladas por la Junta;

3) aun asumiendo, sin aceptar, la existencia de deficiencias, al no conceder un término para la corrección de éstas, violando la igual protección de las leyes y el debido proceso de ley, al concederse a otras instituciones oportunidad para ello;

4) al dar publicidad a la determinación antes de ésta ser final y firme, y;

5) al no declarar la inconstitucionalidad de las Leyes Núm. 31 de 10 de mayo de 1976, *supra*, y la Núm. 1 del 20 de enero de 1966, *supra*, por éstas violar la igual protección de las leyes y el debido proceso de ley, en cuanto pone en manos del organismo rector del Sistema Universitario del Estado la concesión de licencias para operar instituciones privadas.

---

([7]) Veáse el expediente administrativo, Apéndice, pág. 528.

([8]) Véase el expediente administrativo, Apéndice, pág. 521.

([9]) Véase el expediente administrativo, Apéndice, pág. 527.

El tribunal de instancia, luego de evaluar la posición de ambas partes, resolvió que el Consejo no había cumplido con el reglamento aplicable; que había usado en su decisión criterios distintos a los dispuestos por la ley y los reglamentos; que no le había dado peso a la evidencia presentada por la apelada; que no le había dado tiempo suficiente a la apelada para corregir sus deficiencias, y que había publicado un aviso en la prensa del país haciendo pública su determinación de no concederle la renovación de licencia a la facultad, sin ser dicha determinación final y firme. Por lo tanto, le ordenó al Consejo otorgar a la Facultad, Inc. la licencia que ésta solicitaba. Además, declaró inconstitucionales las Leyes Núm. 1 y Núm. 31, según enmendadas, *supra*, en cuanto éstas facultan al Consejo a regular a las instituciones superiores privadas.

Inconforme, el Consejo acudió ante nos solicitando la revisión de los siguientes errores:

*Primero*:

La sentencia dictada es contraria a la prueba que surge del récord administrativo. El Tribunal err[ó] en la apreciaci[ó]n de la prueba y además no tom[ó] en cuenta hechos fundamentales que est[á]n en abierta contradicci[ó]n con la sentencia dictada.

*Segundo*:

La sentencia dictada es contraria a las normas jurisprudenciales vigentes que gobiernan la revisi[ó]n judicial de decisiones administrativas.

*Tercero*:

Err[ó] el Tribunal al concluir que en la evaluación de la Facultad el Consejo aplic[ó] criterios distintos a los dispuestos por la Ley y los Reglamentos.

*Cuarto*:

El Tribunal err[ó] al declarar inconstitucionales la Ley Núm. 31 del 10 de mayo de 1976 y la Ley Núm. 1 del 20 de enero de 1966. Caso Núm. CE-90-103, Petición de revisión, págs. 7–8.

A esta solicitud se unió el Secretario de Justicia, en representación del Estado Libre Asociado de Puerto Rico,

para cuestionar la determinación del tribunal de instancia que declara inconstitucionales las leyes ya aludidas.

Apuntó el Secretario dos errores:

A-Err[ó] el Tribunal Superior al resolver innecesariamente los planteamientos constitucionales presentados por la demandante, por cuanto ya hab[í]a resuelto a su favor sus restantes planteamientos, y las normas de abstención judicial y separación de poderes le impon[í]an el deber de abstenerse de considerar dichos planteamientos.

B-Err[ó] el Tribunal Superior al declarar inconstitucionales las Leyes Número 1 del 20 de enero de 1966 y N[ú]mero 31 del 10 de mayo de 1976, según enmendadas, por cuanto ello no procedía en derecho. Caso Núm. 90-103, Informe del Procurador General, págs. 3–4.

## II

Iniciamos nuestro análisis de los asuntos planteados en este caso reiterando nuestro juicio sobre la importancia que han tenido y que tienen las instituciones educativas privadas de nivel post secundario en Puerto Rico. *Consejo de Educación Superior v. U.I.A.*, 120 D.P.R. 224 (1987). Conocido es que el establecimiento de las universidades privadas ha permitido que la educación superior esté al alcance de un gran número de estudiantes que de otra forma quedaría desprovisto de ésta, ya que en muchas ocasiones, por diversas causas y circunstancias, la universidad pública no puede abrir sus puertas a todas las personas interesadas en obtener o proseguir su formación educativa. Las universidades privadas constituyen alternativas valiosas para la formación de personas deseosas de lograr la superación personal y profesional que apareja la educación universitaria y que es tan indispensable para mantener y prolongar un saludable y duradero bienestar social. *Consejo de Educación Superior v. U.I.A.*, supra, págs. 232–233.

Reiteramos también que la educación superior

... está revestida de un enorme y trascendental interés público. De ahí que todo el proceso de evaluación del sistema educativo,

en todas o algunas de sus fases, aunque necesario, es impres-
cindible hacerlo cuidadosamente, teniendo presente que hay
que hacer un balance entre la necesidad de asegurarse que la
institución está equipada y puede llevar a cabo su cometido
educativo y el deber de fomentar foros para la creación de nue-
vas ideas, conceptos y tendencias. La implantación de la ley
debe resguardar este delicado equilibrio, conservando en las
universidades privadas un ambiente de libertad y abstracción
sustancial. *Consejo de Educación Superior v. U.I.A.*, supra,
págs. 233–234.

A la luz de estas nociones, procedemos a resolver las
controversias ante nos.

## III

 Anterior al año 1976, las instituciones educati-
vas privadas podían ofrecer sus servicios de educación su-
perior sin el requisito de una licencia de autorización o de
algún tipo de acreditación por parte del Estado. Esta situa-
ción, junto a la proliferación de becas y ayudas económicas
federales, dieron lugar al establecimiento en Puerto Rico
de escuelas e instituciones de carácter privado que no cum-
plían con las condiciones mínimas necesarias para llevar a
cabo su cometido educativo y cuyo propósito era a todas
luces de carácter comercial. Ello trajo como consecuencia
que muchos estudiantes se matricularan en dichas institu-
ciones tomando cursos y materias de poco rigor, no reconoci-
dos por ninguna otra universidad debidamente
acreditada. Visto este detrimental desarrollo, y conside-
rando que constituía un *importante interés público* el que
dichas instituciones estuviesen bajo la supervisión del Es-
tado, el legislador tomó acción([10]) y aprobó la Ley Núm. 31

---

([10]) Véase Informe Conjunto de las Comisiones de Instrucción y de Hacienda del
Senado de 23 de mayo de 1975 relacionado con el Proyecto de la Cámara de Repre-
sentantes sobre el Proyecto del Senado Sustitutivo al Proyecto de la Cámara 865. P.
de la C. 865 (2da Conf. Ley Núm. 31), 7ma Asamblea Legislativa. Véase, además,
Exposición de Motivos de la Ley Núm. 31 de 10 de mayo de 1976, Leyes de Puerto
Rico, págs. 82–83.

de 10 de mayo de 1976, *supra*,[11] la cual estableció un sistema obligatorio de licenciamiento para instituciones educativas privadas al nivel post secundario, otorgándole al Consejo[12] la autoridad para conceder, renovar, denegar, suspender o cancelar las licencias correspondientes. Para llevar a cabo su labor, se le encomendó al Consejo la responsabilidad de adoptar las normas y los reglamentos que estas instituciones deberían cumplir para obtener las licencias. *Consejo de Educación Superior v. U.I.A.*, supra, pág. 239. En particular, se le encomendó al Consejo fijar los "requisitos mínimos de planta física, de preparación académica del personal directivo y docente, de servicios bibliotecarios y de laboratorios relacionados, currículo y de capacidad de sostenimiento económico que garantice la continuidad de la enseñanza, la protección de la salud, seguridad de los estudiantes y el cumplimiento de los compromisos hechos por la institución ...". Art. 3 de la Ley Núm. 31, *supra*, 18 L.P.R.A. sec. 2103.

Con la aprobación de esta legislación se buscaba asegurar que las instituciones educativas privadas contarían con los recursos, la planta física, el personal docente y el currículo de enseñanza adecuados, y así se le garantizaría al pueblo que las instituciones de enseñanza cumplirían con el propósito social de educar, evitando que la educación se convirtiera en una actividad comercial.[13]

■ Con arreglo a esta legislación, el Consejo es el organismo público que tiene la responsabilidad de implantar la política pública del país en materia de educación superior. Entre sus funciones está la de velar por que instituciones como la apelada cumplan con los requisitos mí-

---

[11] 18 L.P.R.A. sec. 2101 y siguientes.

[12] Art. 3(g)(1), (2) y (3) de la Ley Núm. 1, *supra*, que introdujo el sistema de gobierno que rige para la Universidad de Puerto Rico y crea el Consejo de Educación Superior.

[13] Véase P. del S. Sustitutivo al P. de la C. 865 (2da Conf. Ley Núm. 31), 7ma Asamblea Legislativa.

nimos de calidad en sus ofrecimientos educativos contemplados en esa política pública, para así proteger el interés general de la comunidad y el bienestar de los que acuden a estudiar allí.

 En el campo de la educación superior —y en particular en lo que concierne a la materia técnica y especializada de evaluar a instituciones como la apelada para decidir si se le concede o no una licencia de renovación— el Consejo tiene a su alcance los medios, la experiencia y un peritaje administrativo únicos en Puerto Rico. Por lo tanto, sus decisiones merecen el mayor grado posible de deferencia por parte de los tribunales cuando éstos son llamados a revisarlas, no debiéndose sustituir los criterios académicos de los educadores por los criterios judiciales. Véanse: *Bauzá v. Morales Carrión*, 578 F.2d 447 (1978); *Rivera v. Benítez, Rector*, 73 D.P.R. 377 (1952). Es decir, en el ámbito de la educación superior son de aplicación nuestras reiteradas decisiones que reconocen el establecido principio de derecho administrativo de que las determinaciones de hecho de organismos y agencias públicas tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca evidencia suficiente para derrotarlas. *Henríquez v. Consejo Educación Superior*, 120 D.P.R. 194, 210 (1987). Los tribunales no deberán alterar las conclusiones de hecho de un organismo o agencia como el Consejo si éstas se fundamentan en suficiente evidencia que surja del récord administrativo considerado en su totalidad. *Henríquez v. Consejo Educación Superior*, supra. A tal efecto aplica aquí lo que expresamos en *J.R.T. v. Escuela Coop. E.M. De Hostos*, 107 D.P.R. 151, 156–157 (1978):

"[L]as conclusiones de la Junta en cuanto a los hechos, si estuvieron respaldadas por la evidencia, serán concluyentes."...

"... Nuestra función es tomar el récord en su totalidad y poner en vigor la orden si encontramos evidencia sustancial para sostener las conclusiones de la Junta."

■ Reiteradamente hemos resuelto que las decisiones de los organismos administrativos merecen la mayor deferencia judicial. Ello es así porque éstos cuentan con experiencias y conocimientos altamente especializados sobre los asuntos que se encomiendan. *Rubin Ramírez v. Trías Monge*, 111 D.P.R. 481, 484–485 (1981); *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 690 (1966). Es por ello que cuando se impugnan sus decisiones los tribunales deben limitarse a indagar sobre la razonabilidad de éstas y no deben sustituirlas por su propio criterio, *M & V Orthodontics v. Negdo. Seg. Empleo*, 115 D.P.R. 183, 188–189 (1984), "a menos que se infrinjan directamente valores constitucionales fundamentales o cuando las actuaciones de estos organismos sean claramente arbitrarias". *Henríquez v. Consejo de Educación Superior*, supra, pág. 212.

En conformidad con estas bien conocidas normas, cuando la apelada cuestionó judicialmente la denegación de su licencia por el Consejo, era deber del tribunal de instancia remitirse a la totalidad del expediente administrativo y examinarlo con el solo fin de determinar si éste era suficiente para sostener las determinaciones adoptadas por el Consejo. La evaluación que hizo el Consejo de las operaciones de la apelada estaba circunscrita a determinar si la institución cumplía o no con los requisitos mínimos impuestos por la reglamentación vigente. Por lo tanto, el ámbito de la revisión judicial debió quedar restringido a la determinacion de si el Consejo ejerció razonablemente su discreción, tomando en cuenta los señalamientos y requerimientos de la Junta, el reconocimiento que hizo la apelada en cuanto a la validez de éstos,[14] el término concedido por el Consejo a la apelada para cumplir con lo

---

[14] Vista de 2 de junio de 1983, pág. 103 (Apéndice, pág. 381), en la que la Facultad reconoció, por conducto de su abogado, lo siguiente:

"... La institución está dispuesta a hacer las enmiendas que sean necesarias y mejorar lo que sea necesario que este Consejo de Educación Superior determine.

requerido por la Junta, la conducta de la apelada durante dicho término y las serias responsabilidades del Consejo bajo las Leyes Núm. 31 y Núm. 1 antes mencionadas.

A tenor con esos factores, surge claramente que la decisión del Consejo fue correcta. Veamos por qué.

En sus Informe de Hallazgos de 16 de noviembre de 1982 e Informe Final de 4 de febrero de 1983 la Junta nombrada por el Consejo presentó una evaluación total de la apelada y, a base de los puntos más sobresalientes que presentamos a continuación, hizo su recomendación final:

*Filosofía y Propósitos*

1. La Facultad para las Ciencias Sociales Aplicadas tienen una filosofía claramente expresada y aceptada por los miembros de su comunidad institucional. *La Facultad no tiene planes definidos para la realización de sus propósitos a largo plazo.* Esto es contrario a lo establecido en el Reglamento Para La Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria (Capítulo V, pág. 18, Sección 1, Inciso c).

*Administración y Gobierno*

2. La estructura de gobierno de la Facultad garantiza que el gobierno, el control y la responsabilidad gerencial real de la institución recaiga sobre sus empleados, en vez de recaer sobre la Junta de Directores según lo establece el Reglamento Para La Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria (Capítulo V, pág. 19, Inciso d).

3. En casi la mitad de los casos no existe evidencia en los archivos de la Facultad de que su personal posee la educación y experiencia necesarias para garantizar que sus estudiantes habrán de recibir la educación y adiestramiento apropiados conforme a los objetivos del programa de estudios seleccionado. Esta evidencia la exige el Reglamento Para La Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria (Capítulo V, pág. 19, Inciso d).

*Finanzas*

4. La Facultad carece de un sistema de contabilidad y auditoría adecuado según lo requiere el Reglamento de Otorgación

---

"No hay lugar a dudas que hay elementos institucionales que hay que mejorar." Caso Núm. CE-90-103, Apéndice XVI, pág. 571.

de Licencia a Instituciones Privadas de Educación Postsecundaria (Capítulo V, pág. 20, Inciso b).

5. La Facultad atraviesa unas dificultades financieras que pueden entorpecer su crecimiento y desarrollo. La institución está financieramente débil como para sostenerse en sus propios pies y garantizar la solidez económica que es necesaria para que haya excelencia académica.

*Programa de Estudios*

6. El programa de estudios de la Facultad conduce a una Maestría en Artes con concentración en Psicología Clínica. Sin embargo, el énfasis del programa de estudios es en la psicoterapia, siendo ésta un área particular de estudio dentro de la psicología clínica. La Junta Consultiva entiende que el programa de estudios de la Facultad es muy especializado, y por lo tanto, no cumple adecuadamente con su propósito de formar psicólogos clínicos.

*Personal Docente*

7. Al considerar lo señalado en ese Capítulo, particularmente respecto a los pocos profesores que poseen el doctorado y la presencia de dos profesores que ni siquiera poseen la Maestría, así como la carencia de prueba adecuada de la especialización y experiencia de la mayoría de la facultad, la Junta Consultiva no puede concluir que el personal docente en total esté capacitado para ofrecer un programa de excelencia conducente a un grado de Maestría en Artes en Psicología Clínica.

*Facilidades Físicas*

8. La facultad no provee un laboratorio para la enseñanza de destrezas en psicoterapia y psicodiagnóstico. El Reglamento Para La Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria (Capítulo V, pág. 22, Inciso b) establece que la institución "debe proveer los laboratorios o talleres debidamente equipados para aquellos cursos o programas que así lo requieran".

La Facultad está muy limitada en algunas facilidades físicas: el salón biblioteca es muy pequeño; la única oficina existente es compartida por el personal administrativo y el personal docente. El Reglamento señala que la institución debe proveer oficinas para su personal administrativo, un salón para biblioteca, etc. (Capítulo V, pág. 20, Inciso c).

*Biblioteca*

9. La biblioteca de la Facultad no cuenta con recursos suficientes para apoyar efectivamente un programa de Maestría en Artes. Sus colecciones de revistas y de referencia son las que están más limitadas. Además, el hecho de que alrededor de la mitad de la colección no está catalogada dificulta grandemente el acceso efectivo a ella.

10. El presupuesto asignado a la Biblioteca es demasiado limitado, especialmente para mejorar la calidad de la colección. Para esto, la biblioteca tiene que contar con suficientes recursos económicos de manera que se pueda adquirir el material necesario y poder seguir aumentando los recursos bibliotecarios en forma efectiva.

*Admisiones y Servicios al Estudiante*

11. La política de puertas abiertas de la institución no va acompañada de unos controles compensatorios para poder diagnosticar deficiencias y proveer los medios para corregirlas. A la Junta Consultiva le preocupa que estudiantes que no tienen ningún trasfondo en el campo de la psicología deban competir con aquellos qu sí lo tienen, dado que la institución no ha provisto unas medidas compensatorias para equiparar a estos estudiantes. *Aún más le preocupa el hecho de que se admiten estudiantes sin bachillerato y no se ofrecen enseñanza remediadora alguna."*

Como puede observarse, las determinaciones de la Junta presentaban un cuadro claro de serias deficiencias institucionales de la apelada en prácticamente *todos* los aspectos esenciales del quehacer educativo. Frente a un señalamiento tan abarcador de la incuestionable inadecuacidad de la apelada como institución docente —que la propia apelada en general finalmente aceptó— el tribunal de instancia concluyó, en primer lugar, que en la evaluación de la apelada el Consejo aplicó criterios distintos a los dispuestos por la ley y los reglamentos. Aludió al uso de unas Guías de Referencia([15]) y a la utilización de los criterios establecidos por la American Psychological Association

---

([15]) Estas guías se conocen con el nombre de *Guías para el Establecimiento y Desarrollo de Instituciones Privadas de Educación Superior en Puerto Rico*, mayo de 1978.

para la evaluación de la formación de psicoterapistas y a los Standards for College Libraries de la American Library Association para la evaluación en el área de la biblioteca. Esta primera conclusión fue errónea porque del expediente administrativo no surge que la Junta designada por el Consejo utilizara criterios distintos a los dispuestos en los reglamentos vigentes para evaluar las operaciones de la Facultad, Inc. Las guías aludidas son unas guías que las juntas consultivas utilizan como fuente de referencia desde 1978 y que desde entonces eran de conocimiento de la apelada. Del Informe de Hallazgos con fecha de 16 de noviembre de 1982 preparado por la Junta surge claramente, además, que la apelada había sido debidamente notificada sobre las leyes y los reglamentos relacionados con los procedimientos de evaluación del Consejo, incluso las guías.

En el caso de autos, las Guías de Referencia fueron usadas en algunas áreas *sólo de modo ilustrativo*. Tal uso de las guías no constituye violación alguna de las leyes y de los reglamentos aplicables. Dichas guías no podían ser utilizadas ni fueron utilizadas por la Junta como criterios *determinantes* en el proceso de evaluación.[16] Del informe final de la Junta de 4 de febrero de 1983 surge claramente que los señalamientos de deficiencias están basados fundamentalmente en la falta de cumplimiento con los reglamentos vigentes, no en la falta de cumplimiento con las Guías de Referencia.

La alusión por la Junta a los criterios de la *American Psychological Association* y de la *American Library Association* se realizó igualmente para ilustrar y reforzar sus señalamientos. Si se descartaran esas referencias, aún los señalamientos se sostendrían de forma independiente con el solo apoyo de los reglamentos. Erró, pues, el tribunal de instancia en su apreciación sobre el particular.

En segundo lugar, el tribunal de instancia también con-

---

[16] Véase *Guías de Referencia*, *Exhibit* VIII, pág. 2, último párrafo de la Introducción.

cluyó que no se había dado peso a la evidencia presentada por la institución apelada y que no existía suficiente evidencia en el récord para sostener las conclusiones del Consejo. Esta conclusión también fue errónea. Con arreglo a las normas mencionadas antes sobre el alcance de la revisión judicial de las decisiones del Consejo y sobre la deferencia que merecen las determinaciones de hechos de organismos administrativos como éste, el foro a quo estaba obligado por las conclusiones de la Junta formuladas por miembros respetados de la comunidad académica y especialistas en sus respectivas áreas profesionales luego de una evaluación cuidadosa de todos los componentes institucionales, y aceptadas finalmente por la apelada. La presunción de regularidad y corrección que tiene por ley la decisión del Consejo debió tener peso en la limitada revisión que le correspondía hacer al tribunal recurrido. *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 331 (1987). Las determinaciones de hecho del Consejo tenían carácter final para el tribunal, ya que gozaban de apoyo sustancial en el récord administrativo. *Concepción v. Junta de Contabilidad*, 80 D.P.R. 194, 199 (1958); *Rivera v. Benítez, Rector*, supra, págs. 381–383 y 390. Un examen cuidadoso de la totalidad del récord administrativo y de la transcripción de las vistas celebradas debió haber llevado a tribunal de instancia a la conclusión de que existía suficiente evidencia sustancial para sostener las conclusiones del Consejo, sobre todo en vista de la admisión que hizo la propia apelada de sus limitaciones.

En el caso de autos, el tribunal apoyó su sentencia en datos aislados favorables a la institución, en vez de realizar su función revisora a la luz de los principios y criterios jurisprudenciales antes mencionados.

En tercer lugar, el tribunal de instancia concluyó, también erróneamente, que el Consejo no le concedió tiempo suficiente a la apelada para corregir sus deficiencias. La Facultad, Inc. tuvo más de 8 meses, contados a partir de la

última vista administrativa de 2 de junio de 1983, para cumplir con los señalamientos de la Junta Consultiva, y durante ese tiempo ni siquiera presentó una propuesta adecuada que permitiera al Consejo concluir que se tenía un plan de trabajo que permitiera a la institución encarrilar sus operaciones conforme a las directrices que le fijó la Junta. Más aún, las deficiencias señaladas por la Junta eran tan abarcadoras que hacían razonable la inferencia tácita del Consejo, al cabo de ocho meses de espera, de que la apelada realmente no podía subsanar las fallas identificadas en ningún período de tiempo razonable adicional.

En cuarto lugar, el tribunal también resolvió que la publicación de un aviso por el Consejo en un periódico de circulación general en el que se informaba la acción tomada en cuanto a la solicitud de renovación de licencia de la apelada fue prematuro y que la afectó adversamente. Aquí, de nuevo, la conclusión del foro a quo no procedía. El Consejo publicó el aviso aludido porque por reglamento ello era mandatorio. Dicho aviso tiene el propósito público de mantener informados a los estudiantes que interesen seguir estudios superiores del *status* de las distintas instituciones de educación superior en el país, conforme a la política pública del Estado y a la Ley Núm. 31, *supra*. Véase *Reglamento para la Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria.*[17] La apelada no se quejó de que el anuncio fuera incorrecto o engañoso. Protestó solo porque se hizo cuando alegadamente todavía la decisión del Consejo en su caso no era final y firme. Sin embargo, un examen del *Reglamento para la Otorgación de Licencia a Instituciones Privadas de Educación Postsecundaria* refleja que éste no establece la condición alegada por la apelada. No se impone la limitación alegada. El Consejo, pues, actuó correctamente al publicar el aviso conforme a su responsabilidad legal.

---

[17] Véase esc. 4.

## IV

El Tribunal Superior también erró al resolver innecesariamente los planteamientos constitucionales presentados por la apelada, por cuanto ya dicho foro judicial había resuelto a su favor sus otras alegaciones, y conocidas normas de abstención judicial y separación de poderes le imponían el deber de abstenerse de considerar dichos planteamientos. El asunto constitucional planteado en el caso de marras era tan solo una de las cinco cuestiones sometidas ante el tribunal de instancia para su consideración. Los otros planteamientos, como ya hemos visto, no cuestionaban la validez constitucional de disposición de ley alguna y todos fueron resueltos por el tribunal a quo a favor de la apelada.

En *Ashwander v. Valley Authority*, 297 U.S. 288, 345 (1936), el Juez Brandeis sentó las pautas adoptadas posteriormente por el propio Tribunal Supremo federal para decidir si debe considerar o no cuestiones constitucionales que le han sido planteadas. Señaló:

> ... The Court will not pass upon a constitutional question although properly presented by record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Ashwander v. Valley Authority*, supra, pág. 347.

Nostros hemos adoptado ésta y las demás limitaciones señaladas en *Ashwander v. Valley Authority*, supra. *Molina v. C.R.U.V.*, 114 D.P.R. 295, 324 (1983); *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 728 (1982); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772, 783–784 (1968); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 596–598 (1958). En estos casos hemos reiterado la norma de que los tribunales no deben pasar juicio sobre la constitucionalidad de las leyes cuando se puede resolver el caso con arreglo a otros crite-

rios y fundamentos. Particularmente en *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979), dijimos que los tribunales no entrarán a determinar la validez constitucional de una ley si en el caso existen otros planteamientos no constitucionales, a base de los cuales se podría dictar sentencia. En vista de esta clara y conocida doctrina establecida sobre abstención judicial, una vez el tribunal de instancia decidió varios planteamientos jurídicos ordinarios a favor de la Facultad, Inc., no había necesidad de dilucidar la cuestión constitucional que le fuera planteada y debió abstenerse de hacerlo. *E.L.A. v. Aguayo*, supra. Al así hacerlo, se excedió del marco de sus atribuciones.

No obstante lo anterior, este Tribunal sí tiene que considerar los méritos del asunto de la constitucionalidad, en vista de que en la tercera parte de esta opinión hemos resuelto que el foro de instancia erró en los otros fundamentos a base de los cuales resolvió a favor de la apelada. No teniendo éstos otros fundamentos en apoyo de su contención, tenemos que considerar el planteamiento de la apelada sobre la supuesta inconstitucionalidad de las leyes al amparo de los cuales actuó el Consejo.

## V

El tribunal de instancia declaró que las Leyes Núm. 31 y Núm. 1, según enmendadas, *supra*, en cuanto ponen en manos del organismo rector del sistema universitario del Estado la concesión de licencias para operar a instituciones privadas, son inconstitucionales, por ser "contrario a las garantías de la sección 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico sobre el debido proceso de ley e igual protección de las leyes".

Aunque el foro a quo invocó tanto el debido proceso de ley como la igual protección de las leyes para declarar inconstitucionales los estatutos aludidos, lo cierto es que

basó su breve y escueto análisis *únicamente* en el señalamiento de que dentro del concepto del debido proceso de ley, el juzgador no puede ser parte interesada en el asunto ante su consideración. Citó el tratado de Davis de derecho administrativo como único fundamento de su contención, aduciendo que el juzgador administrativo está sujeto a las mismas reglas que los jueces en cuanto a la descalificación por interés.[18] Indicó, además, que las facultades que las leyes antes mencionadas le otorgan al Consejo provocan una situación de conflicto de intereses, supuestamente porque una le impone la obligación de velar por el desarrollo, crecimiento, fomento y excelencia del sistema universitario del Estado y, por otro lado, otra le concede la facultad de regular aquellas instituciones que compiten con el sistema universitario público. Según el foro a quo, ese esquema permite al Consejo ahogar una institución que surge precisamente como alternativa crítica de la enseñanza tradicional de la psicología en Puerto Rico, cuyo principal exponente hasta ahora había sido el sistema universitario público.

■ El aludido razonamiento del tribunal de instancia es incorrecto. Reiteradamente el Tribunal Supremo de Estados Unidos ha señalado, como nosotros mismos lo hemos hecho, que el derecho al debido proceso de ley es de naturaleza circunstancial y pragmática. *Domínguez Talavera v. Tribunal Superior*, 102 D.P.R. 423 (1974); *Pueblo v. Andreu González*, 105 D.P.R. 315 (1976). Aquí, ello significa que para que sea válido el planteamiento de inconstitucionalidad por falta de debido proceso no puede ser una mera alegación de parcialidad basada en generalidades. Para tener éxito, la apelada tenía que demostrar de modo fehaciente que el Consejo tomó la decisión de no renovarle su licencia a fin de favorecer a la Universidad de Puerto Rico. Esto, claro está, no se demostró de modo alguno. En el caso

---

[18] 2 *Davis, Administrative Law Treatise* Sec. 12.03, pág. 153 (1958).

de autos no hubo ni un ápice de evidencia que tendiese a demostrar que el Consejo actuó movido por parcialidad o que tuviese algún conflicto de interés que viciase su decisión. Como ya hemos señalado, el Consejo basó su determinación estrictamente en los hallazgos y las recomendaciones de una junta consultiva imparcial, integrada por reputados representantes de *varios* recintos universitarios, incluso dos de las principales universidades privadas del país, que a su vez actuó a base de un estudio contundente del asunto. Para invocar el debido proceso de ley como lo hizo el foro a quo no bastan de ningún modo las conjeturas y especulaciones vagas e intangibles. Es imprescindible probar concretamente que la actuación impugnada se basó en el interés real adverso del que decidió, cosa que en este caso no se estableció ni remotamente. *Henríquez v. Consejo de Educación Superior*, supra, pág. 210. No procede, pues, declaración alguna de inconstitucionalidad sobre la base del debido proceso de ley.

En cuanto a la invocación que hace el tribunal de instancia de la igual protección de las leyes, no podemos descifrar fácilmente qué tenía en mente el juez al hacerla. En su sentencia no discute el asunto de modo alguno. No hay ni una oración que explique por qué el foro a quo pensó que las leyes en cuestión son supuestamente discriminatorias. Es difícil colegir cuál es la base del señalamiento de instancia porque el caso ante nos no presenta ninguna de las clasificaciones que tradicionalmente están en juego cuando se invoca el derecho a la igual protección de las leyes. La parte apelada en su alegato dirigió su contención esencialmente hacia el citado "conflicto de interés" que alegadamente tiene el Consejo por su dualidad como cuerpo regente del sistema público y como acreditador del sistema privado. El propio tribunal de instancia aludió a ese supuesto "conflicto de interés" en las expresiones generales que brevemente hizo al declarar la inconstitucionalidad de los estatutos en cuestión.

■ Si el planteamiento es entonces que hubo trato desigual al denegarse la licencia de la apelada porque los programas similares o análogos de la Universidad de Puerto Rico no se desautorizan por el Consejo, tal planteamiento es inmeritorio por las razones ya señaladas antes al discutir el debido proceso de ley. El supuesto trato desigual aquí no constituye un discrimen injustificado, que es lo que prohíbe la cláusula invocada. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 545 (1984). Para que una acción gubernamental —que deniega a una persona lo que le permite a otra— sea inválida bajo la igual protección de las leyes, tal acción debe constituir un *trato desigual impermisible o injustificado. M. & B.S., Inc. v. Depto. de Agricultura*, supra; *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102 (1991); *Salas v. Municipio de Moca*, 119 D.P.R. 625 (1987). Es decir, la acción gubernamental debe ser una desigualdad basada en prejuicio, *Vda. de Miranda v. Srio. de Hacienda*, 114 D.P.R. 11 (1982); debe constituir un discrimen por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o ideas religiosas. En este caso, el trato desigual se debió a un motivo muy justificado de política pública. La apelada no satisfacía los requisitos mínimos necesarios para funcionar como institución docente de educación superior. Bajo cualquiera de los criterios que se han desarrollado jurisprudencialmente para desplegar y desenvolver el principio de la igual protección de las leyes, la determinación del Consejo en este caso era válida. Constituía un medio necesario para la consecución de un interés público apremiante. *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472 (1989); *Vélez v. Srio. de Justicia*, supra.

■ La legislación en cuestión, que ya la habíamos analizado sin encontrarle reparos constitucionales en *Consejo de Educación Superior v. U.I.A.*, supra, no presenta propiamente problema alguno de igual protección. Se trata

de leyes que el Estado ha establecido en aras del funda-
mental interés público de asegurar que las instituciones
que se dedican a la enseñanza posean los requisitos míni-
mos necesarios para llevar a cabo su cometido educativo.
Constituyen, pues, legislación adoptada al amparo del am-
plio poder de razón de estado. *M. & B.S., Inc. v. Depto. de
Agricultura*, supra, pág. 337; *Román v. Trib. Exam. de Mé-
dicos*, 116 D.P.R. 71 (1985); *Ortiz Cruz v. Junta Hípica*, 101
D.P.R. 791 (1973); *Asoc. Drs. Med. Cui. Salud v. Morales*,
132 D.P.R. 567 (1993). La amplia discreción gubernamen-
tal para salvaguardar este interés público es bien conocida
y ha sido extensamente aceptada en otras jurisdicciones
con ordenamientos constitucionales similares al nuestro.
Se ha señalado que:

> The substantial interest and broad discretion that the state has
> in regulating its schools and the quality of education provided
> to its citizens is also well established. *Nova Univ. v. Educatio-
> nal Inst. Licensure*, 483 A.2d 1172, 1184 (1984); *Marjorie Webs-
> ter Jr. Col., v. Middle States Ass'n of C. & S. S.*, 432 F.2d 650,
> 654 (1970); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

Si se examinan cuidadosamente las leyes en cuestión
podrá observarse que conforme a éstas la función principal
del Consejo es la de fiscalizar *todas* las instituciones de
educación superior del país. No tiene responsabilidad al-
guna de velar por que el sistema universitario público so-
bresalga o prevalezca sobre las instituciones privadas del
país. Su responsabilidad en aras del bienestar general es
la de asegurar que tanto la Universidad de Puerto Rico
como las universidades privadas le sirvan bien a la
colectividad. El esquema considerado en la legislación per-
tinente no es de competencia y rivalidad entre el sistema
público y el privado, sino de *complementaridad*, y la enco-
mienda del Consejo es la de velar por que *ambos sistemas*,
por sí solos y conjuntamente, le sirvan bien al país.

En la práctica, ello ha ocurrido así. A través de los años
el Consejo ha cumplido la labor que por ley se le ha

encomendado. Bajo su amparo han florecido exitosamente tanto la Universidad de Puerto Rico como las instituciones privadas. Desde la fecha en que se le confirió al Consejo la autoridad para licenciar y acreditar los centros docentes privados, han nacido y se han desarrollado *decenas* de estas instituciones. El Consejo les ha aprobado *cientos* de programas nuevos. Hoy día las universidades privadas, sobre todo las seis o siete principales, tienen más de cien mil estudiantes —muchos más que los que asisten a la Universidad de Puerto Rico— que obtienen una buena educación que los capacitará para enfrentarse al futuro provechosamente. Estas instituciones, al igual que la Universidad de Puerto Rico, han crecido y se han fortalecido vigorosamente bajo la tutela del Consejo, que ha velado por que *todas* ellas mantengan estrictas normas de calidad y que sus ofrecimientos académicos sean adecuados. A la misma vez, claro está, el Consejo ha propiciado el cierre de muchas otras instituciones que realmente no tenían la capacidad docente mínima necesaria. Al promover el desarrollo de unas y la clausura de otras, el Consejo ha actuado en consecución de los altos objetivos públicos que se le encomendaron. Su gestión al ordenar el cierre de instituciones que no cualifican responde a su responsabilidad de proteger el interés público, y no puede justamente decirse que la misma es contraria a las entidades docentes privadas. Más bien, la acción del Consejo les beneficia, pues tiene el efecto de excluir del sistema a instituciones deficientes que pueden darle mal nombre a las entidades privadas como grupo, a la vez que le da distinción y prestigio a las que sí obtienen licencia o acreditación. Como bien se ha señalado:

> Requiring degree-conferring institutions to meet reasonable academic standards is not only in the best interests of the public, but also in the best interest of educational institutions, for in the last analysis, the viability of such institutions depends in large part on public esteem and support. *Nova Univ. v. Educational Inst. Licensure*, supra, pág. 1187.

Suponer, pues, como lo hizo el tribunal de instancia, que existía un "conflicto de interés" ínsito en este entramado es mal entender tanto el esquema legislativo como la realidad sociológica de nuestro sistema universitario. Ciertamente su decisión fue infundada y el señalamiento de inconstitucionalidad tanto innecesario como inválido.

Para concluir, debe señalarse que nada de lo dicho aquí alude al conocido debate académico sobre si el Consejo es o no el mejor organismo para supervisar todo el sistema universitario del país, tanto el público como el privado. Sabemos que se discute en Puerto Rico si esa compleja función debe mantenerse en una sola entidad o si debe dividirse en dos organismos separados. No emitimos juicio sobre los aspectos de política pública de dicho asunto. No nos compete resolverlos. Si hay o no razones prácticas o de política pública para mantener las estructuras actuales o cambiarlas, es cuestión que le toca decidir primordialmente a las ramas políticas del Gobierno. Nosotros nos limitamos a resolver el asunto, totalmente distinto, de que la imputación jurídica de conflicto de intereses que se le hizo al Consejo en este caso es infundada y que los estatutos que crean y rigen al Consejo actualmente no adolecen de vicios constitucionales.

Por los fundamentos expuestos, *se dictará sentencia para revocar la emitida por el Tribunal Superior, Sala de Guayama, el 28 de diciembre de 1989.*

El Juez Asociado Señor Rebollo López disintió sin opinión escrita. El Juez Asociado Señor Negrón García no intervino.