*714 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el Sr. Néstor Rivera Serrano (el Sr. Rivera o el recurrente) mediante el recurso de revisión de epígrafe. Nos solicita que revoquemos la Resolución Nunc Pro Tune emitida por la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Público (la CASARH) el 19 de mero de 2007 y notificada el subsiguiente día 26. Por medio de ésta, la CASARH se negó a reconsiderar su previo dictamen que declaró no ha lugar la apelación incoada por el recurrente en la que impugnó su destitución ie la Policía Municipal de Carolina.
Examinados cuidadosamente y en su totalidad los documentos que obran en el expediente de autos, la transcripción de los procedimientos y el derecho aplicable, resolvemos confirmar la Resolución recurrida.
I
El Sr. Rivera se desempeñaba como guardia municipal del Municipio de Carolina (el Municipio o el recurrido), cuando el 28 de agosto de 1998 se le informó sobre una querella en su contra firmada por el entonces Alcalde, Sr. José E. Aponte (el Alcalde). La querella tenía como título: “Posible Encubrimiento del Sr. Orlando Serrano Ramos T/C/P ‘Tandy ’ ” y explicaba lo siguiente:

“El lunes 24 de agosto de 1998, como a las 8:30 p.m., fue asaltada la Panadería La Moderna del Bo. Fortuna de Luquillo y allí fueron asesinados dos agentes de la Policía Estatal de Puerto Rico que llevan el nombre de Billy Colón Crespo y Ramón Ramírez Castro.

Hemos recibido información de que uno de los asaltantes, de nombre Orlando Serrano Ramos, es su tío. IÉJste estaba prófugo del Campamento El Zarzal de Río Grande y estando prófugo de la justicia efectuó el isalto. Nuestro informante nos dice que su tío estuvo en la residencia en que usted vive ubicada en el Edificio B-10, Apartamento 4 del Residencial Roberto Clemente en el Bo. Martín González de Carolina, que ha conversado ?on su hermana, Isidra Serrano Ramos, quien es su mamá y usted ha tenido conocimiento de tales hechos y no Informó de esa situación a la Policía Estatal, así como a los oficiales de la Guardia Municipal de Carolina. La ictuación suya en este asunto ha llegado hasta el punto de que su hermano Franky fue arrestado por haber llevado a su tío, el asaltante Serrano Ramos hasta el pueblo de Maunabo. Entendemos de que (sic) de toda esa útuación usted tenía conocimiento y al no dar parte ni a la Policía Estatal ni a sus supervisores en la Guardia Municipal usted ha incurrido en el delito de encubrimiento.

[...]

*715
Conforme a la investigación que hemos efectuado, su tío Orlando Serrano Ramos se fugó del Campamento El Zarzal desde fines de junio de 1998, estuvo después de esa fecha circulando y visitando el Residencial Roberto Clemente y pernoctando en su casa en algunas ocasiones y esa información y conocimiento usted no la dio ni a la Administración de Corrección, ni a la Policía Estatal ni a sus supervisores en al Guardia Municipal para detenerlo. Usted mismo, con autoridad para ello no lo arrestó. Su inacción, anteponiendo sus relaciones de consanguinidad a las obligaciones que le impone su membresía en la Guardia Municipal de Carolina, culminó con la tragedia ocurrida en las Parcelas Fortuna de Luquillo el 24 de agosto de 1998.

[...]

En su caso, usted ha demostrado incompetencia y mala conducta así como con su encubrimiento ha incurrido en la comisión de un delito grave. [...]” 
[1]

A base de lo antes citado, el Alcalde optó por suspender sumariamente al recurrente de su empleo. Además, le notificó que tenía intención de destituirlo del puesto de Guardia Municipal. Por último, le advirtió que de no estar de acuerdo con tal decisión podía solicitar una Vista Administrativa Informal dentro del término de quince (15) días contados desde el recibo de la querella.
El 30 de marzo de 1999 se celebró la Vista Administrativa Informal. Posteriormente, el 9 de abril de igual año, el Oficial Examinador que dirigió la aludida vista recomendó al Alcalde que destituyera al recurrente de su puesto de Guardia Municipal. A esos fines, sostuvo que:

“Existe en este caso una testigo que manifiesta que un prófugo de la justicia era escondido en casa de un Guardia Municipal de Carolina, con el conocimiento de éste. Es intolerable que esto ocurra con un Agente del Orden Público de este Municipio, que entre sus deberes está el arrestar a cualquier persona que cometa un delito en su presencia. [E]l sabe que su tío es prófugo, por lo que está cometiendo un delito en su presencia y debe arrestarlo en ese momento. ” 
[2]

En virtud de ello, el 21 de abril de 1999, el Alcalde destituyó al recurrente de su puesto de Guardia Municipal efectivo al 1 de junio de 1999.
No satisfecho, el 7 de junio de 1999, el Sr. Rivera presentó Petición de Apelación ante la Junta de Apelaciones del Sistema de Administración de Personal, lo que se convirtió luego en la CASARH. Señaló que erró el Municipio al expulsarlo “siendo dicha expulsión una infundada, violatorio del debido proceso de ley y discriminatorio por razón de origen social e imputarle responsabilidad alguna por razón de parentesco y [/jo infundados delitos por alegada asociación de afinidad.” [3] Alegó que se le violó su debido proceso de ley porque lo expulsaron de su puesto sin prueba de cargo, sólo por motivos de afinidad. Además, adujo que durante la celebración de la vista no compareció el querellante ni se aportó prueba alguna en su contra. Por su parte, el 5 de octubre de 1999, el recurrido presentó su réplica a la apelación.
Así las cosas, los días 15 de marzo y 20 de junio de 2002, el 27 de enero de 2003 y el 9 de noviembre de 2005 se celebraron las correspondientes vistas ante la CASARH. El Sr. Rivera presentó como prueba su propio testimonio, el de su madre, la Sra. Isidra Serrano y el de su hermano, el Sr. Frankie Rivera Serrano. De otro lado, el Municipio presentó el testimonio de la Sargento Isaura Rosado Carmona (la Sargento Rosado).
El 20 de octubre de 2006, la CASARH declaró no ha lugar la apelación presentada por el recurrente. [4] Basó su dictamen en las determinaciones de hechos y conclusiones de derecho esbozados en el Informe de la Oficial Examinadora. En razón de la credibilidad que le merecieron los testigos, la Oficial Examinadora formuló las siguientes determinaciones de hechos:

*716
“1. El [recurrente] formaba parte de la Policía Municipal de Carolina, al momento en que fue destituido de su posición.

2. El [recurrente] es sobrino del Sr. Orlando Serrano Ramos t/c/p “Landy’, acusado de asesinar a dos policías el 24 de agosto de 1998 en la panadería “La Moderna ” en Luquillo, PR.

3. El [recurrente] tenía conocimiento de que su tío, Orlando Serrano Ramos, se encontraba confinado en una de las cárceles del país.

4. Orlando Serrano Ramos había sido convicto de varios delitos y al momento de los hechos que dieron lugar a la destitución del [recurrente], se encontraba evadido de la institución penal conocida como “El Zarzal ” en Río Grande.

5. El 24 de agosto de 1998 hubo un robo en la panadería "La Moderna” en el Barrio Fortuna de Luquillo.

6. Durante dicho robo, dos agentes de la Policía Estatal fueron asesinados por los asaltantes. Entre los acusados de este crimen se encontraba el Sr. Orlando Serrano Ramos.

7. El [recurrente] al momento de los hechos residía en el Edificio B-l, Apt. #10 del Residencial Roberto Clemente, Carolina junto a su compañera consensual.

8. La Sra. Lsidra Serrano Ramos, madre del [recurrente], reside en el Edificio B-10, Apt. #4 del Residencial Roberto Clemente, Carolina junto a su hijo Frankie Rivera Serrano.

9. El Sr. Orlando Serrano Ramos fue arrestado en el pueblo de Humacao, luego de haberse personado en la casa de su hermana, la Sra. lsidra Ramos, en el Residencial Roberto Clemente en Carolina.

10. La Sra. lsidra Ramos no le permitió al Sr. Orlando Serrano permanecer en su hogar debido a que le traería problemas a su hijo, el guardia municipal N[é]stor L. Rivera Serrano.

11. El 26 de agosto de 1998, la Sargento Lsaura Rosado Carmona recibió una confidencia telefónica en el cuartel de Villa Esperanza, en la cual le informaron que el Sr. Orlando Serrano Ramos se encontraba en el en (sic) Edificio B-10, Apt. #4 del Residencial Roberto Clemente en Carolina.

12. Dicho confidente le informó a la Sargento Rosado Carmona que las personas que habían asesinado los dos policías en la panadería "La Moderna” en Luquillo se encontraban en el [R] esidencial Roberto Clemente en Carolina, identificándolos por sus nombres.

13. El confidente le informó a la Sargento Rosado Carmona que el Sr. Orlando Serrano Ramos estaba pernoctando en la casa de su hermana, Sra. lsidra Serrano Ramos.

14. El 26 de agosto de 1998, la Sargento Rosado Carmona se comunicó telefónicamente con una amiga y vecina del [R]esidencial Roberto Clemente, quien le manifestó que se encontraba reunida en su casa con la Sra. lsidra Serrano Ramos.

15. La Sargento Rosado Carmona sostuvo una conversación telefónica con la Sra. Serrano Ramos, en la cual la madre del [recurrente] le informó que su hermano era responsable de los asesinatos de los dos policías en Luquillo. También le informó a la Sargento Rosado Carmona que su hermano había querido quedarse en su casa, situación que no permitió para no perjudicar a su hijo N[é[stor L Rivera Serrano.

*717
16. La Sargento Rosado Carmona le informó a la Sra. Isidra Serrano que toda vez que su hijo era policía municipal, [éjste tenía el deber de arrestar a su tío o de reportarlo a la Policía de Puerto Rico, y que de no hacerlo estaría incumpliendo con sus deberes y responsabilidades.

17. El 28 de agosto de 1998, el [Alcalde] le comunicó al Sr. N[é]stor I. Rivera Serrano que había procedido a suspenderle sumariamente del empleo y se le imputó haber encubierto las actuaciones de su tío.

18. En esa misma fecha, el [recurrente] se comunicó con la Sargento Rosado Carmona y le comentó que la persona que había cometido el crimen de la panadería "La Moderna ”, era su tío. En esta misma conversación, el [recurrente] le manifestó a la Sargento Serrano Rosado que él y su tío eran “dos mundos apartes” y que desde que ocurrieron los hechos él había cumplido con su trabajo y no había faltado al mismo.

19. Luego de celebrado el proceso administrativo a nivel municipal, el [recurrente] fue destituido de su puesto como guardia municipal el 21 de abril de 1999, mediante comunicación escrita del Hon. José E. Aponte. ” 
[5]

La Oficial Examinadora concluyó que el conocimiento del Sr. Rivera respecto al paradero de su tío sin notificárselo a las autoridades pertinentes justificaba su destitución de la Guardia Municipal, ya que con su silencio incurrió en varias faltas graves. A tales fines, expresó lo siguiente:

“A la luz de la prueba que nos mereció credibilidad, es forzoso concluir que el [recurrente] conocía que el Sr. Orlando Serrano Ramos se había fugado de una institución penal y era el principal sospechoso de los asesinatos ocurridos en la panadería “La Moderna ”, en Luquillo. Esto se debe a que aun tomando como cierto que el [recurrente] residía en el Edificio B 1, Apt. #10, entendemos que resulta poco creíble el argumento del [recurrente] en cuanto a que no sabía que su tío había visitado la residencia de su madre. Siendo así las cosas, no nos queda más que concluir que dicho conocimiento debió haber sido divulgado a las autoridades, si es que no era capaz de arrestar al sospechoso él mismo. Como expresamos anteriormente, empatizamos (sic) con la situación tan difícil a la que se enfrentó el [recurrente], pero es en este tipo de circunstancia que el verdadero carácter de una persona sale a relucir. ” 
[6]

Cónsono con ello, determinó que la actuación del Municipio no fue arbitraria, ilegal o discriminatoria, ya que tuvo suficiente prueba ante sí para tomar una decisión racional.
Insatisfecho, el 29 de noviembre de 2006, el recurrente presentó Solicitud de Reconsideración. Argüyó que ninguna de las determinaciones de hechos esbozadas por la Oficial Examinadora estableció que éste tuviera conocimiento del lugar donde su tío se ocultaba o que tuviera algún tipo de comunicación con su tío. Además, expuso que las conclusiones de derecho de la Oficial Examinadora no eran cónsonas con la prueba desfilada durante las vistas ante la CASARH. Argumentó que la prueba presentada en su contra no era confiable, pues estaba basada en suposiciones, en prueba de referencia y en confidencias no corroboradas.
Posteriormente, el 11 de diciembre de 2006, la CASARH acogió la reconsideración presentada por el recurrente y le ordenó al Municipio que en un término de diez (10) días fijara su posición. En consecuencia, el subsiguiente día 18 el recurrido presentó Moción en Cumplimiento de Orden. Sostuvo que hasta esa fecha, el Sr. Rivera no le había notificado de su moción de reconsideración y que al desconocer de su contenido no estaba preparado para fijar su posición al respecto. En virtud de ello, señaló que tal omisión por parte del recurrente violó el Artículo II del Reglamento Procesal de la CASARH, por lo que procedía declarar no ha lugar su reconsideración. En la alternativa, solicitó que se le ordenara al recurrente notificarle la aludida moción de reconsideración y se le concediera un término adicional para contestarla.
No obstante, el 27 de diciembre de 2006, la CASARH emitió la siguiente Resolución: “A la Moción en *718 cumplimiento de orden, presentada por la parte apelante el 18 de diciembre de 2006: NO HA LUGAR. ”. En respuesta, el 1 de enero de 2007, el Municipio presentó Moción de Reconsideración y/o en Solicitud de que se Aclare y/o Enmiende la Resolución del 27 de diciembre de 2006 a los fines de que la CASARH aclarara la Resolución antes citada, pues hacía referencia a la Moción en Cumplimiento de Orden del 18 de diciembre de 2006, pero especificaba que fue presentada por la parte apelante, entiéndase, el recurrente.
A tales efectos, el 19 de enero de 2007, la CASARH emitió una Resolución Nunc Pro Tune. Explicó que por error oficinesco su Resolución del 27 de diciembre de 2006 hizo referencia a la Moción en Cumplimiento de Orden cuando debió referirse a la Solicitud de Reconsideración. De este modo, enmendó la Resolución emitida para declarar no ha lugar la reconsideración solicitada por el Sr. Rivera. La Resolución enmendada fue notificada el 26 de enero de 2007.
No conforme, el 26 de febrero de 2007, el recurrente presentó el recurso de epígrafe. Señaló la comisión del siguiente error:

"ERR[Ó] LA COMISI[Ó]N APELATIVA DEL SISTEMA DE ADMINISTRACION DE RECURSOS HUMANOS DEL SERVICIO P[Ú]BLICO AL ACOGER EL INFORME DE LA OFICIAL EXAMINADORA, EN EL QUE SE RECOMENDO QUE LA COMISlON DECLARASE NO HA LUGAR LA APELACION YA QUE LA PRUEBA QUE TUVO ANTE SU CONSIDERACION LA OFICIAL EXAMINADORA NO SE FUNDAMENTA EN UNA BASE RACIONAL NI EN PRUEBA SUSTANCIAL QUE JUSTIFIQUE SU RECOMENDACION ”

Alegó que las conclusiones de la Oficial Examinadora no estaban sostenidas por la prueba que tuvo ante su consideración. Reiteró que en ninguna de las determinaciones de hechos plasmadas en el Informe de la Oficial Examinadora se estableció que de alguna manera ocultó o encubrió a su tío prófugo. Argüyó que el testimonio de la Sargento Rosado fue contradictorio y por ello no cumplió con el estándar de evidencia sustancial. Agregó que el Municipio lo acusó de un posible encubrimiento, pero que éste no fue procesado criminalmente por tales hechos. Finalmente, indicó que la prueba desfilada ante la CASARH demostró que la actuación del recurrido fue arbitraria, irrazonable y sin ninguna evidencia sustancial que la fundamentara. De otra parte, el 28 de marzo de 2007, el Municipio presentó su escrito de oposición.
El 11 de junio de 2007 emitimos una Resolución en la que le ordenamos al Sr. Rivera que nos supliera la transcripción de la prueba oral desfilada ante la CASARH en un término de treinta (30) días. Luego de varias prórrogas, el 30 de noviembre de 2007, el recurrente nos proveyó la transcripción solicitada.
Con el beneficio de ambas comparecencias, procedemos a resolver.
II
Como cuestión de umbral, reafirmamos el principio de que a toda determinación administrativa le cobija una presunción de regularidad y corrección. Tal y como lo ha interpretado el Tribunal Supremo de Puerto Rico en numerosas ocasiones, la revisión judicial de este tipo de decisiones se circunscribe a determinar si la actuación de la agencia es arbitraria, ilegal, o tan irrazonable que la misma constituye un abuso de discreción. Otero v. Toyota, 163 D.P.R. 716 (2005); Pacheco v. Estancias, 160 D.P.R. 409 (2003); E.L.A. et als. v. Malavé, 157 D.P.R. 586 (2002); Mun. de San Juan v. J.C.A., 149 D.P.R. 263 (1999); Franco v. Depto de Educación, 148 D.P.R. 703, 709 (1999).
La presunción de corrección que acarrea una decisión administrativa, deberá sostenerse por los tribunales a menos que la misma logre ser derrotada mediante la identificación de evidencia en contrario que obre en el expediente administrativo. E.L.A. v. P.M.C., 163 D.P.R. 478 (2004); A.R.P.E. v. Junta de Apelaciones Sobre Construcciones y Lotificaciones, 124 D.P.R. 858 (1989); Henríquez v. Consejo de Educación Superior, *719 120 D.P.R. 194 (1989); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692 (1975). Ello debido a que los tribunales deben dar deferencia a las determinaciones de las agencias sobre asuntos que se encuentren dentro del área de especialidad de éstas. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, (2000); Fac. C. Soc. Aplicadas, Inc. v. C.E.S., 133 D.P.R. 521 (1993); Asoc. Drs. Med. Cui. Salud v. v. Morales, 132 D.P.R. 567 (1993).
Al enfrentarse a una petición para revisar judicialmente una determinación administrativa, el tribunal analizará sí conforme al expediente administrativo: 1) el remedio concedido fue razonable; 2) las determinaciones de hechos están razonablemente sostenidas por la prueba; y 3) las conclusiones de derecho del organismo administrativo son correctas. P.R.T.Co. v. J. Reg. Tel. de P.R., 151 D.P.R. 269 (2000); Mun. de San Juan v. J.C.A., 149 D.P.R. 263 (1999); Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656 (1997). Véase, Demetrio Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da. Ed., Bogotá, Forum, 2001, págs. 533-536.
En cuanto a la revisión de las determinaciones de hechos de la agencia, la facultad revisora del foro judicial está limitada por la sección 4.5 de la L.P.A.U., 3 L.P.R.A. § 2175. Dicha sección establece que “[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo. ” Véase, Rebollo v. Yiyi Motors, 161 D.P.R. 69 (2004); Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70 (2000); Domínguez v. Caguas Expressway Motors, Inc., 148 D.P.R. 387 (1999). El expediente administrativo constituirá la base exclusiva para la decisión de la agencia y para la revisión judicial de ésta. Comisionado v. Prime Life, 162 D.P.R. 334 (2004); Torres v. Junta Ingenieros, 161 D.P.R. 696 (2004).
El concepto de evidencia sustancial ha sido definido por la jurisprudencia como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. Ramírez Rivera v. Depto. de Salud, 147 D.P.R. 901 (1999); Misión Ind. P.R. v. J. P., 146 D.P.R. 64 (1998); Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953). Ello no requiere que a la luz de la prueba que obre en autos la decisión de la agencia refleje la única conclusión lógica a la que podría llegar un juzgador. Pero tampoco se considerará como correcta una determinación sostenida por un mero destello de evidencia. Id. El criterio rector en estos casos, será la razonabilidad de la determinación de la agencia luego de considerarse el expediente administrativo en su totalidad. Id.; Otero v. Toyota, supra; Fuertes v. A.R.P.E., 134 D.P.R. 947 (1993). Por ende, la parte que impugna judicialmente las determinaciones de hechos de una agencia administrativa, tiene el peso de la prueba para demostrar que éstas no están basadas en el expediente o que las conclusiones a las que se llegó son irrazonables. Ramírez Rivera v. Depto. de Salud, supra; Misión Ind. P.R. v. J.P., supra.
Conforme a lo dispuesto por ley, existe una práctica judicial claramente establecida de conceder gran consideración y deferencia a las decisiones de los foros administrativos. Otero v. Toyota, supra; Rebollo v. Yiyi Motors, supra; Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908 (1998). Dicha deferencia emana del reconocimiento de que, de ordinario, las agencias administrativas están en mejor posición para hacer determinaciones de hechos al tratar con una materia sobre la cual tienen un conocimiento especializado. Id; Véase, Metropolitana S.E. v. A.R.P.E., 138 D.P.R. 200 (1995); Gallardo v. Clavell, 131 D.P.R. 275 (1992). Más aún, cuando una determinación de una agencia esté sustentada por evidencia sustancial que obre en el expediente del caso, los tribunales deben abstenerse de sustituir el criterio de la agencia por el judicial. Otero v. Toyota, supra; Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85 (1997).
No obstante, el que los tribunales den un alto grado de deferencia a los dictámenes de las agencias no significa una abdicación de la función revisora del foro judicial. Rivera Concepción v. A.R.P.E., supra; Del Rey v. J.A.C.L., 107 D.P.R. 348 (1978). Por el contrario, los tribunales tienen el deber de proteger a los ciudadanos contra posibles actuaciones ultra vires, inconstitucionales o arbitrarias de las agencias. Las determinaciones de los foros administrativos no gozan de deferencia cuando éstos actúan de manera arbitraria, ilegal, irrazonable o ante la ausencia de prueba adecuada o cuando la agencia cometió error manifiesto en la apreciación de la *720 misma. Comisionado v. Prime Life, supra; Torres v. Junta Ingenieros, supra; O.E.G. v. Rodríguez, 159 D.P.R. 98 (2003).
Ahora bien, según lo dispone la mencionada Sección 4.5 de la L.P.A.U., “[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal. ” El razonamiento detrás de esta disposición, es que los tribunales gozan de peritaje en cuanto a las cuestiones legales por lo cual no se adelanta ningún fin público dándole deferencia a la agencia en cuanto a este aspecto. San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. 374 (2001); Miranda v. C.E.E., 141 D.P.R. 775 (1996).
Sin embargo, lo anterior no quiere decir que los tribunales deben descartar livianamente las conclusiones de derecho hechas por las agencias administrativas. La jurisprudencia interpretativa del Tribunal Supremo tiende a señalar que los tribunales deben dar gran peso y deferencia a las aplicaciones e interpretaciones que hagan las agencias con respecto a las leyes y reglamentos que éstas administran. Ello, debido a que por tratarse de áreas del derecho que manejan a diario, las agencias desarrollan un conocimiento especializado al respecto que no debe ser menospreciado. Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; Rivera Rentas v. A & C Development, 144 D.P.R. 450 (1997).
El criterio de revisión en cuanto a las interpretaciones legales hechas sobre los estatutos que maneja la agencia debe ser también uno de razonabilidad. Aún así, la deferencia que merecen estas interpretaciones legales, cede ante una actuación irrazonable o ilegal que justifique que el tribunal ejerza su función revisora en protección de la ciudadanía. Pacheco v. Estancias, supra. Véase, Adorno Quiles v. Hernández, 126 D.P.R. 191 (1990).
No obstante, en cuanto a las conclusiones de derecho que no envuelven interpretaciones de las leyes y reglamentos que administra la agencia cuya decisión es impugnada ni dentro del área de especialidad de ésta, las mismas son revisables por los tribunales sin limitaciones. Misión Ind. P.R. v. J.P., supra; Rivera Rentas v. A & C Development, supra.
Ahora bien, tal norma de deferencia judicial no abarca la evaluación de prueba documental o pericial, debido a que en estos casos el foro apelativo está en las mismas condiciones que el tribunal de primera instancia. Por tal razón, los tribunales apelativos pueden adoptar su propio criterio en cuanto al valor probatorio de ese tipo de evidencia. Rebollo v. Yiyi Motors, supra.
m
En síntesis, el recurrente alega que la CASARH erró al denegarle su apelación basada en el Informe de la Oficial Examinadora. En virtud de ello, indica que la Oficial Examinadora no contó con prueba sustancial que justificara su recomendación de declarar no ha lugar su apelación. Aduce que las conclusiones de la Oficial Examinadora no estaban sostenidas por la prueba que tuvo ante su consideración, ya que no se comprobó que éste tenía conocimiento del paradero de su tío prófugo o que tenía comunicación con éste.
Al tratarse de un cuestionamiento sobre la apreciación de la prueba, le solicitamos al Sr. Rivera que nos proveyera la transcripción de la prueba oral vertida durante la celebración de las vistas administrativas. Así, nos proveyó la transcripción de las vistas celebradas el 15 de marzo y el 20 de junio de 2002 y el 5 de noviembre de 2005. La transcripción cuenta con los testimonios de la Sargento Rosado, el Sr. Frankie Rivera Serrano y del recurrente. Al examinar la aludida transcripción, advertimos que no tiene la totalidad de los testimonios vertidos durante las vistas. Notamos que no está transcrito el examen directo efectuado a la Sargento Rosado ni lo acontecido durante la vista del 27 de enero de 2003 que incluía el testimonio de la madre del recurrente y la primera parte del examen directo realizado al Sr. Rivera.
Además de la prueba oral, surge del expediente que las partes también presentaron prueba documental. La *721 Oficial Examinadora contó, entre otros, con: (i) la investigación administrativa efectuada por el Municipio la cual incluía las declaraciones juradas de la Sargento Rosado y del Sr. Carlos M. Velázquez Rodríguez, Comisionado de la Guardia Municipal de Carolina; (ii) la Hoja de Asistencia del Sr. Rivera referente a la semana del 24 al 28 de agosto de 1998; y (iii) partes de prensa de varios rotativos del país que reseñan los hechos aquí en controversia.
Al examinar minuciosamente la prueba ante nos, concluimos que la Oficial Examinadora y la CASARH no actuaron arbitraria o irrazonablemente al denegar la apelación presentada por el Sr. Rivera. Veamos.
Como parte de la prueba documental suplida, contamos con la declaración jurada de la Sargento Rosado. De dicha declaración se desprende que el 26 de agosto de 1998, la Sargento Rosado recibió una confidencia telefónica en la cual le informaron que Landy estaba quedándose en el Residencial Roberto Clemente, específicamente en casa de su hermana, la Sra. Isidra Serrano, madre del recurrente. En razón de ello, la Sargento Rosado acudió al CIC de Carolina e intercambió tal información con el Inspector Jorge L. Rivera. Luego, llamó a una amiga que vive en el Residencial Roberto Clemente, quien le informó que la Sra. Isidra Serrano estaba en su casa, por lo que tuvo oportunidad de hablar con ésta vía telefónica. Respecto a dicha conversación, declaró lo siguiente:

"Mi amiga me preguntó que si me había enterado de lo que había salido en el periódico y por televisión sobre las muertes de los policías. Al yo decirle que no sabía nada, [é]sta me dijo que quien había matado esos policía en Luquillo, había sido el hermano de [Isidra], Que [Isidra] en esos momentos estaba con ella y me preguntó si deseaba hablar con ella. Le indiqué que sí que me la pusiera al teléfono para hablar con ella. [Isidra] se puso al teléfono llorando y me dijo que en efecto había sido su hermano Landy, refiriéndose a Orlando Serrano Ramos, el que había matado a los policías en Luquillo. Landy había querido quedarse en su casa. Ella le había dicho que no podía quedarse porque eso le afectaba su hijo Billy, refiriéndose al GM Néstor Rivera. Que ella iba a hablar con otro hermano y con su hijo el GM Néstor Rivera, para que Landy se entregar (sic) con un Pastor.

Le indiqué que su hijo era Guardia Municipal y conocía la Ley, que [e[l deber de él era arrestar a su tío Landy o reportar a la Policía de Puerto Rico esta situación para que se ayudara, ya que de no hacerlo estaba en omisión al cumplimiento de su deber como Guardia. Le dije además, que desde que ocurrieron los éstos (sic) hechos de los cuales él, refiriéndome al GM Néstor Rivera, tenía conocimiento de todo y en ningún momento no me notificó nada. Que con su actuación, además, por no cumplir con su deber estaba violando la Ley. Como ésta estaba llorando terminé de hablar y le dije que yo iba a estar pendiente, ya que ella me había dicho que me iba a llamar tan pronto hablara con su hijo el GM Néstor Rivera Serrano. ” [7] (Enfasis nuestro)
Prosiguió con su declaración e indicó que esa noche montó una vigilancia en los alrededores del mencionado Residencial y vio allí al Sr. Carlos Rubén Velázquez, el otro sospechoso del doble asesinato. Por último, expresó que su confidente le informó que a Landy se lo habían llevado para el Municipio de Maunabo.
Por otro lado, la declaración jurada del Sr. Carlos M. Velázquez Rodríguez, Comisionado de la Guardia Municipal de Carolina, refleja que ante la información brindada por la Sargento Rosado la CIC de Carolina comenzó una investigación sobre el recurrente por un posible acto de encubrimiento. Al tenor de tal investigación, el Municipio decide suspender sumariamente al Sr. Rivera y dar inicio a su propia investigación administrativa.
Surge también del expediente que la División de Asuntos Internos del Municipio realizó la investigación correspondiente sobre el Sr. Rivera. Así, el 9 de octubre de 1998, el Investigador asignado refirió su investigación, la cual contó con las declaraciones juradas antes citadas, al Director de la División de Asuntos Internos del Municipio. En tal informe, el investigador concluyó que el Sr. Rivera violó varios artículos del *722 Reglamento de la Guardia Municipal de Carolina.
Por otra parte, tuvimos la oportunidad de examinar la transcripción suplida por el recurrente. En resumen, de la transcripción surge que la Sargento Rosado no tenía conocimiento propio de que efectivamente Landy pernoctaba en casa de la Sra. Isidra Serrano, sino que recibió tal información mediante una confidencia telefónica. De otro lado, el Sr. Frankie Rivera declaró que vivía con su madre, la Sra. Isidra Serrano, y que al momento de los hechos, el recurrente no vivía con ellos. Explicó que el Sr. Rivera vivía en el mismo Residencial, pero en otro apartamento junto a su primera esposa. Enfatizó que no tuvo contacto alguno con su tío prófugo. Por su parte, el recurrente testificó que la última vez que vio a su tío fue en el año 1993. Añadió que el 25 de agosto de 1998 tuvo conocimiento de lo acontecido porque lo vio en la televisión y que desconocía que su tío se había fugado de la Institución Penitenciaria. A preguntas de la Leda. Raquel Torres Laureano, expresó que a pesar de que identificó la foto de su tío por la televisión como el presunto sospechoso del doble asesinato, no lo informó a sus superiores. Declaró que el Municipio lo suspendió sumariamente sin celebrar la investigación correspondiente y que no fue denunciado o encausado criminalmente por el delito de encubrimiento.
Cabe puntualizar que la transcripción que tuvimos ante nuestra consideración no resultó ser idónea para evaluar la totalidad de la prueba testifical desfilada en las vistas administrativas. Como mencionáramos, el recurrente nos proveyó una transcripción fragmentada. No contamos con el examen directo de la Sargento Rosado, por lo que no pudimos comparar su declaración jurada con su testimonio. Tampoco contamos con el testimonio de la Sra. Isidra Serrano. El único testimonio que el recurrente nos proveyó en su totalidad fue el del Sr. Frankie Rivera. Sin embargo, de la transcripción surge que su testimonio fue confuso y evasivo. [8] Ante tal escenario, nos cuestionamos la razón por la cual el recurrente nos proveyó una transcripción segmentada e incompleta, limitando así nuestra función revisora.
Al tenor de la prueba examinada, concluimos que razonablemente la CASARH entendió que el recurrido tuvo motivos suficientes para ordenar una investigación sobre el Sr. Rivera y actuó conforme los resultados de dicha investigación. Además, las determinaciones de hechos esbozadas por la Oficial Examinadora estuvieron basadas en la prueba testifical y documental desfilada en las vistas. De igual modo, las conclusiones de derecho no resultaron irrazonables.
Existió una confidencia telefónica que informó que Landy estaba en los alrededores del Residencial Roberto Clemente y que se estaba quedando en casa de la Sra. Isidra Serrano. De la declaración jurada ofrecida por la Sargento Rosado, se desprende que la Sra. Serrano le informó que su hermano Landy le había pedido quedarse en su casa, pero que ésta no se lo permitió. No obstante, tal información demuestra que, en efecto, ésta tuvo comunicación con Landy y que éste estuvo por los alrededores del referido Residencial. De la prueba oral vertida por el Sr. Frankie Rivera y del propio recurrente surgió que este último, aunque no vivía en la casa de su madre, vivía en el mismo Residencial a aproximadamente cuatro a cinco calles de distancia. De esta manera, no resulta irrazonable pensar que el recurrente tuvo conocimiento de que su tío estaba en los alrededores del Residencial y no lo informó a sus superiores o a la Policía. Aunque la prueba no demuestra directamente que el recurrente tuviera el conocimiento imputado, existió prueba indirecta o circunstancial que estableció tal conocimiento. Al analizar dicha prueba conjuntamente con la credibilidad que la Oficial Examinadora le atribuyó a ésta, se sostiene la Resolución recurrida.
Precisa señalar que la prueba presentada por el Sr. Rivera no demostró su falta de conocimiento en tomo a los hechos delictivos cometidos por su tío, según alegó. La Oficial Examinadora de la CASARH, entre otros, concluyó, como hecho probado, que el recurrente se comunicó con la Sargento Rosado y le dijo que su tío había cometido el crimen de la Panadería de Luquillo, demostrando con ello el conocimiento de éste sobre su tío. (Determinación de hecho #18) Por otro lado, se desprende del expediente que la Oficial Examinadora de la CASARH no le dio credibilidad al testimonio prestado por el recurrente. Asimismo, del expediente surge que el *723 Oficial Examinador que presidió la Vista Administrativa Informal ante la Policía señaló que existía un testigo que estableció que el Sr. Rivera tenía conocimiento de que Landy estaba escondido en la casa de su hermana.
Por último, debemos mencionar que el recurrente, tanto en sus escritos como en su testimonio ante la CASARH, enfatizó que nunca fue denunciado o encausado criminalmente por el delito de encubrimiento. No obstante, es norma reiterada que el procedimiento criminal posee distinta naturaleza que el procedimiento disciplinario administrativo por lo cual una absolución en la esfera penal no libera de responsabilidad en el campo administrativo. Reyes Salcedo v. Policía, 143 D.P.R. 85 (1997); Pagán Hernández v. U.P.R., 107 D.P.R. 720 (1978); Mundo v. Tribunal Superior, 101 D.P.R. 302 (1971). Por ello, nuestro Tribunal Supremo ha establecido claramente que el procedimiento criminal y el procedimiento disciplinario administrativo son independientes el uno del otro, por lo que la absolución en un procedimiento criminal no confiere inmunidad en relación con un procedimiento disciplinario administrativo por los mismos hechos. Trib. Exam. Méd. v. Cañas Rivas, 154 D.P.R. 29 (2001); Pagán Hernández v. U.P.R., supra. Esto es así, entre otras razones, porque los referidos procedimientos conllevan, cada uno, un grado (quántum) de prueba distinto. Trib. Exam. Méd. v. Cañas Rivas, supra; Reyes Salcedo v. Policía de P.R., supra. Por ello, el hecho de que no lo denunciaron por el delito de encubrimiento no implica que a nivel administrativo no sea procesable o que la agencia cometió un error de derecho al destituirlo.
Acorde con todo lo anterior, procede que confirmemos la Resolución recurrida. Este Tribunal le debe deferencia a la credibilidad que le diera la Oficial Examinadora a los respectivos testimonios y a su apreciación de la prueba. El Sr. Rivera no logró rebatir la presunción de corrección que cobija a los dictámenes administrativos. Por el contrario, a base de la prueba evaluada, entendemos que la determinación de la CASARH fue razonable, no arbitraria, y basada en evidencia sustancial obrante en el expediente.
IV
Por los fundamentos expuestos, se confirma la Resolución emitida por la CASARH el 19 de enero de 2007.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz Secretaria del Tribunal de Apelaciones
ESCOLIOS 2009 DTA 15

1. Apéndice del recurso, págs. 1-2.

2. Apéndice del recurso, pág. 6.

3. Apéndice del recurso, pág. 14.

4. El 10 de noviembre de 2006, CASARH notificó nuevamente la Resolución del 20 de octubre de 2006, ya que por inadvertencia la primera notificación se le envió a quien ya no era el representante legal del Sr. Rivera.

5. informe de la Oficial Examinadora, págs. 2-5.

6. Informe de la Oficial Examinadora, pág. 8.

7. Apéndice del Alegato en Oposición de la Parte Recurrida, pág. 17.

8. Véase Transcripción págs. 98-107.