Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| PBJL ENERGY CORPORATION | | *REVISIÓN ADMINISTRATIVA* procedente del Puerto Rico Energy Bureau, Public Service Regulatory Board |
|---|---|---|
| Recurrente | | |
| v. | KLRA202500295 | Caso número: NEPR-QR-2021-0026 |
| PUERTO RICO ELECTRIC POWER AUTHORITY | | Sobre: Final resolution and order |
| Recurrido | | |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 27 de agosto de 2025.

Comparece la parte recurrente, PBJL Energy Corporation (PBJL o parte recurrente), mediante un recurso de revisión administrativa y nos solicita que revisemos la *Resolución Final y Orden*[1] emitida y notificada el 19 de diciembre de 2024, por el Negociado de Energía de Puerto Rico (Negociado o NEPR[2]). Mediante el referido dictamen, el Negociado acogió el acuerdo de transacción suscrito por PBLJ y la Autoridad de Energía Eléctrica de Puerto Rico (en adelante AEE o recurrida) y ordenó el archivo con perjuicio del caso.

Examinado el recurso, el alegato de la parte recurrida y el expediente administrativo, confirmamos la Resolución recurrida.

## I.

El 15 de marzo de 2021, PBJL presentó una querella en contra de la AEE ante el Negociado de Energía (NEPR-QR-2021-0026). En

---

[1]Véase, *Final Resolution and Order,* Apéndice del recurso, págs. 1-3.
[2] En inglés, *Puerto Rico Energy Buerau* (PREB).

Número Identificador

SEN2025 _____

esta, alegó que la AEE, mediante información incompleta y engañosa, manipuló datos y empleó una metodología defectuosa en su evaluación de los contratos de compraventa de energía (*Power Purchase Operating Agreements* o *PPOA,* por sus siglas en inglés) sometidos para evaluación de la Junta de Supervisión Fiscal (JSF[3]). Alegaron que, lo anterior incidió en que la evaluación de su proyecto de energía renovable, Montalva Solar Farm (Montalva), no quedara en el primer lugar de clasificación de proyectos de 150 MW aprobados por la JSF. La recurrente esbozó que no se le dio oportunidad para refutar y remediar las inquietudes infundadas de la AEE. Arguyó que la clasificación de los proyectos se hizo en secreto y sin considerar el diseño superior y ventajas operacionales de Montalva, los cuales no fueron ofrecidos ni igualados por ningún otro proyecto[4]. PBJL sostuvo, además, que Montalva debió ser incluido en el PPOA y estar entre las primeras posiciones, u ocupar la primera posición, de los proyectos clasificados. Por ello, le solicitó al Negociado que suspendiera y paralizara la ejecución de los PPOA que fueron elegidos[5].

El 4 de mayo de 2021, la AEE presentó una solicitud de desestimación[6]. En esta, adujo que el Negociado carecía de jurisdicción sobre la materia para intervenir en la fase de evaluación de una PPOA y que la querella presentada por PBJL no exponía una reclamación que justificara la concesión de un remedio. PBJL presentó su oposición el 26 de mayo de 2021. En esa misma fecha, también presentó una *Segunda Querella Enmendada* y una *Moción de Paralización y Auxilio de Jurisdicción*[7]. En esta, PBJL alegó que el Negociado tenía autoridad para emitir una orden a la AEE

---

[3] En inglés *Federal Oversight Management Board* o FOMB por sus siglas en inglés.)
[4] Los demás proyectos clasificados se denominan como *Legacy Projects*.
[5] Xzerta y CIRO fueron los *Legacy Projects* aprobados en la PPOA.
[6] *Motion to Dismiss PBJL Energy's Complaint for Failure to State a Claim.* Véase, pág. 1 de la resolución recurrida).
[7] *Motion for Order to Stay in Aid of Jurisdiction. Íd.*

paralizando los procedimientos, incluyendo la selección de Xzerta y CIRO, sin que estos hubieran pasado por un proceso competitivo de solicitud de propuesta y ejecución (*Request for Proposal* o *RFP*, por sus siglas en inglés) de los contratos aplicables hasta que la querella incoada por PBJL fuera resuelta. El 18 de noviembre de 2021, la AEE presentó solicitud de desestimación de la Segunda Querella Enmendada por falta de jurisdicción sobre la materia y por no exponer una reclamación que justificara la concesión de un remedio[8]. El 20 de diciembre de 2021, PBJL se opuso y el 12 de enero de 2022, la AEE presentó réplica a la oposición de la recurrente[9].

Así las cosas, el 16 de febrero de 2022, se celebró una vista en la que las partes solicitaron un término para alcanzar un acuerdo transaccional[10]. Luego de varios trámites procesales y extensiones de término, el 3 de octubre de 2023, PBJL y la AEE presentaron una *Moción Conjunta para Presentar Acuerdo Transaccional*[11] (Moción Conjunta). En esta, las partes incluyeron un *Settlement Agreement* (Acuerdo Transaccional)[12]. En lo pertinente a la controversia ante nuestra consideración, las partes acordaron lo siguiente:

> 10. Las partes reconocen: (i) el proyecto Montalva no es un proyecto "Contratado", sino un proyecto bajo negociaciones transaccionales dentro de un litigio; (ii) el proyecto Montalva bajo negociación está limitado a 80 MW en este momento, no 165 MW (con una segunda fase de 85 MW adicionales a ser evaluados en el futuro)[13]; (iii) el proyecto Montalva aún debe obtener el desarrollo de proyecto necesario para varios de los estudios de interconexión propuestos por LUMA, tareas y/o evaluaciones a ser conducidas como parte de los estudios de interconexión propuestos. Por tanto, las partes entienden que los estudios de LUMA, aunque necesarios y esenciales para la aprobación final del proyecto Montalva, no deben ser requeridos en este

---

[8] *Motion to Dismiss PBJL Energy's Second Amended Verified Complaint for Lack of Subject-Matter Jurisdiction and Failure to State a Claim Upon Which a Relief can be Granted.*

[9] *Opposition to Motion to Dismiss*; *Reply to PBJL'S Opposition to PREPA'S Motion to Dismiss.*

[10] *Final Resolution and Order,* Apéndice del recurso, pág. 1.

[11] *Joint Motion to Submit Settlement Agreement.* (*Íd.*, a la pág. 2).

[12] El acuerdo fue firmado el 3 de octubre de 2023 por ambas partes.

[13] PREPA no se compromete a una segunda fase.

momento. La peticionaria PBJL entiende la necesidad de los estudios de interconexión de LUMA, pero solo en el momento en que las negociaciones transaccionales con PREPA hayan producido un contrato aceptable, favorable y endosado entre PREPA y PBJL, y tal contrato haya sido aprobado por la Junta de Gobierno de PREPA, PREB y FOMB, todos estos endosos, consentimientos y aprobaciones sujetos y condicionados a los resultados favorables y exitosos de los eventuales estudios de interconexión de LUMA a realizarse al final del proceso, sin autorización de construcción a realizarse sino por el Proyecto Montalva para entrar en funcionamiento hasta que la interconexión haya sido completamente aprobada por LUMA. **El peticionario PBJL entiende y acuerda la obligación asumida en este párrafo del Acuerdo Transaccional para la validez, ejecutabilidad y operabilidad de este acuerdo y la aprobación del Proyecto Montalva.**

**11. El Peticionario PBJL está consciente de la necesidad de tal intervención de LUMA y se compromete a asumir y/o ocuparse de los costos razonables que dicha determinación de interconexión conlleve, incluyendo todas las mejoras necesarias o reparación de San German TC (Line L-37100), hasta $15,740,000.00[14], por un proyecto de 80 MW de este tipo para ser interconectado de forma adecuada y segura.** Además, Peticionario PBJL acuerda no reclamar repago o tener derecho a cualquier tipo de desembolso de dicha inversión para arreglar o mejorar las instalaciones de interconexión, sea de LUMA o PREPA. **Peticionario PBJL entiende y acuerda la obligación asumida en este párrafo del Acuerdo Transaccional esencial para la validez, ejecutabilidad y operabilidad de este acuerdo y la aprobación del Proyecto Montalva.**

12. Con el fin de lograr una transacción y seguir adelante para las evaluaciones y aprobaciones necesarias para el Proyecto Montalva, las partes por la presente acuerdan transar bajo varios términos y condiciones importantes, particularmente aquellos que hubieran potencialmente permitido a PBJL alcanzar una posición competitiva para los 150 MW sometidos por PREPA a la JSF para la aprobación de los Proyectos Legacy, si no hubiera sido por la remoción cuidadosa del Proyecto Montalva de dicha competencia. **En consecuencia, PBJL se compromete a honrar su precio propuesto a PREPA el 20 de julio de 2020 de $0.0985 por Kwh, a pesar de las condiciones inflacionarias que ha forzado a los demás proponentes, participantes previos de los Proyectos Legacy y demás, a someter propuestas renegociadas con precios significativamente más elevados.** Aún más, con el fin de afianzar dicha estructura, PBJL se compromete a limitar su propuesta de ajuste a $0.115, con aumentos de no más de $0.005 por año limitado y/o nunca a exceder a $0.115 por Kwh durante la totalidad del término de la PPOA, sin cargo o derecho monetario para un sistema de almacenamiento de batería completamente operacional hasta 36 MW a ser

---

[14] Nota al calce omitida.

provistos por PBJL como parte de su proyecto Montalva. **Las partes acuerdan hacer los cambios necesarios, enmiendas, ajustes y o correcciones al borrador de la PPOA del 20 de julio de 2020, para reflejar dichos detalles acordados y aquellos expresados en este Acuerdo Transaccional, como términos esenciales y condiciones para la ejecución y aprobación del PPOA procurado en el presente Acuerdo Transaccional.[15]**

---

[15] Traducción y énfasis nuestro.

Las cláusulas, según pactadas, se transcriben como siguen:

10. The parties acknowledge: (i) the Montalva Project is not a "Contracted" project, but a project undergoing settlement negotiations within litigation; (ii) the Montalva Project undergoing settlement negotiations is limited to 80 MW at this time, not 165 MW (with a second phase of an additional 85 MW to be evaluated in the future); (iii) the Montalva Project has yet to attain the necessary project development for several of the LUMA intended Interconnection Studies' tasks and/or evaluations to be conducted as part of the proposed Interconnection Studies. Therefore, the parties understand LUMA's Interconnection Studies, **though necessary and essential to final approval of the Montalva Project,** should not be required at this time. Petitioner PBJL understands the need for LUMA['s] Interconnection Studies, **but only at a time when settlement negotiations with PREPA and PBJL, and such contract has been approved by PREPA's Governing Board, the PREB and FOMB, all said endorsements, consents and approvals subject to and conditioned to favorable and successful results of LUMA's eventual Interconnection Studies to be performed at the very end of the process, with no authorization for construction to proceed nor the Montalva Project to come on line until interconnection has been fully approved by LUMA.** Petitioner PBJL understands and agrees the obligation assumed in this paragraph of the Settlement Agreement to be essential to the validity, enforceability and operability of this Agreement and the Montalva Project's Approval.

11. Petitioner PBJL is well aware of the need for such LUMA intervention and commits to assume and/or undertake all reasonable costs said interconnection determination entails, including any and all necessary upgrades or fixing of the San German TC (Line L-3710), up to $15,740,000.00, for an 80 MW project of this kind to be properly and safely interconnected. Furthermore, Petitioner PBJL agrees not to demand repayment nor to be entitled to any kind of reimbursement of said investment to fix and/or upgrade the interconnection facilities, either from LUMA or PREPA. Petitioner PBJL understands and agrees the obligation assumed in this paragraph of the Settlement Agreement to be essential to the validity, enforceability and operability of this Agreement and the Montalva Project's approval.

12. In order to attain settlement and move forward to additional evaluations and approvals necessary for the Montalva Project, the parties hereby agree to settle under several important terms and conditions, particularly those that would have potentially allowed PBJL to reach a competitive position for the 150 MW submitted by PREPA to FOMB for approval of the Legacy Projects, was it not for the cautious removal of the Montalva Project from said competition. Accordingly, PBJL commits to honoring its July 20, 2020 proposed pricing to PREPA of $0.0985 per Kwh, despite inflationary conditions that have forced additional proponents, former Legacy Project participants and otherwise, to submit renegotiated proposals with much higher pricing. More so, in order to taper said pricing structure, PBJL commits to limit its escalator proposal to $0.115, with increases of no more than $0.005 per year capped and/or never to exceed the referred $0.115 per Kwh during the entire term of the PPOA, with no charge or monetary entitlement for a fully operational battery storage system of up to 36 MW to be provided by PBJL as part of its Montalva Project. The

13. Las partes entienden y reconocen que este Acuerdo Transaccional es recomendado para un proyecto de energía solar renovable (primera fase de Montalva Solar Farm) y no incluye el diseño original (proyecto 100 MW) ni su proyecto de máxima capacidad (proyecto 165 MW). De igual forma, ambas partes reconocen y acuerdan que la aprobación y ejecución de la PPOA aquí procurada no conlleva que PBJL expanda su proyecto Montalva más allá de los 80 MW bajo escrutinio ni le da a PBJL ningún derecho preferente de procurar aprobación de 85 MW adicionales u otros para el Proyecto Montalva. Cualquier solicitud deberá ser presentada a PREPA y/o la entidad que evalúa dichas extensiones, expansiones o aumentos en capacidad de energía renovable y aprobaciones de LUMA u otra entidad con jurisdicción en aquellos asuntos al momento en que se solicite. (Énfasis nuestro).

En resumen, PBJL se comprometió, entre otras cosas, a honrar su propuesta de precio sometida a la AEE el 20 de julio de 2020 de $0.0985 por KWh, a pesar de las condiciones inflacionarias que habían obligado a otros proponentes a someter propuestas renegociadas con precios significativamente más altos. La recurrente también acordó limitar el mecanismo de aumento (escalador) a $0.115, con incrementos de no más de $0.005 por año, con un tope y/o límite absoluto de $0.115 por KWh durante la vigencia del PPOA. En virtud de lo anterior, solicitaron al Negociado que decretara el archivo del caso, con perjuicio. Asimismo, solicitaron al Negociado que retuviera jurisdicción a los únicos fines de hacer cumplir el Acuerdo.

---

parties agree to make the necessary changes, amendments, adjustments and/or corrections to the draft PPOA of July 20, 2020, to reflect these agreed upon details and those stated in ¶¶ 10-11 of this Settlement Agreement, as essential terms and conditions for execution and approval(s) of the PPOA sought under this Settlement Agreement.

13. The parties understand and acknowledge this Settlement Agreement is of an 80 MW renewable solar power project (Montalva Solar Farm Project's first phase) and does not include the original design (100 MW project) nor its full potential project (165 MW). Likewise, both parties acknowledge and agree that approval and execution of the PPOA sought herein does not entail PBJL to expand its Montalva Project beyond the 80 MW under scrutiny nor gives PBJL any preferential rights to pursue approval of additional 85 MW or otherwise for the Montalva Project. Any such request must be submitted to PREPA and/or the entity evaluating such extensions, expansions or increases in renewable energy production capacity, including interconnection conditions, accommodations, and approvals from LUMA or any other entity with jurisdiction on those matters at the time the request is made. (Negritas en el original).

El 19 de diciembre de 2024, el Negociado de Energía emitió la *Resolución Final y Orden*[16] recurrida. En síntesis, el Negociado determinó que la partes cumplieron con la solicitud de desistimiento presentada conforme requiere la Sección 4.03 del Reglamento 8543. En virtud de lo anterior, el Negociado acogió el Acuerdo Transaccional presentado y ordenó el cierre del caso, con perjuicio, según solicitado por las partes.

Inconforme, el 8 de enero de 2025, PBJL presentó una solicitud de reconsideración[17]. En síntesis, le solicitó al Negociado que reconsiderara la *Resolución Final y Orden*, a los fines de dar oportunidad a las partes para finalizar y presentar ciertas modificaciones de los términos del Acuerdo Transaccional. Junto con la reconsideración, PBJL acompañó los cambios propuestos, los cuales estaban bajo discusión con la AEE, respecto a las cláusulas 11, 12 y 13 del Acuerdo, así como una propuesta de borrador de la PPOA que incorporaba los términos del Acuerdo Transaccional. Además de los términos pactados en el Acuerdo Transaccional, PBJL incluyó en la propuesta de borrador de PPOA lo que denominó como "actualizaciones apropiadas" con el fin de aclarar los términos y condiciones contenidos en la PPOA. PBJL alegó que las modificaciones y actualizaciones propuestas eran necesarias debido a los cambios económicos significativos acontecidos, tales como costos y tarifas de deudas e intereses más elevados, los efectos de la inflación, tarifas del costo de equipo, transportación y suministros de construcción, entre otros. Abundó que ello resulta en costos más elevados de mano de obra, un aumento y alto costo del seguro de huracanes, entre otros costos operativos y de mano de obra. Arguyó que tales cambios económicos impactaron otros proyectos solares y

---

[16] Véase, *Final Resolution and Orden,* Apéndice del recurso págs. 1-3.
[17] *Filing for Reconsideration of the Puerto Rico Energy Bureau ("PREB") Final Resolution and Order of December 19, 2024, with Reference to the Montalva Solar Farm Project, Case No. NEPR-QR-2021-0026.*

de almacenamiento en Puerto Rico que han requerido revisiones en los términos comerciales de sus PPOA. Además, PBJL solicitó que se aclare la *Resolución Final y Orden*, dado que la AEE no podía ejecutar unilateralmente la PPOA sin el consentimiento y aprobación del Negociado, y que cualquier desistimiento del caso con perjuicio exige dicha aprobación y aclaración del Negociado. Argumentaron que, el hecho de que el Negociado retuviera jurisdicción sobre el Acuerdo Transaccional no proveía de su faz una aprobación de éste y la PPOA, a menos que el Negociado así lo consignara en la *Resolución Final y Orden.*[18] Sobre dicho argumento, PBJL esbozó que la intención de las partes en la Moción Conjunta era que se lograra dicha aprobación y aclaración, pues estos solicitaron al Negociado que *aceptara* el acuerdo transaccional entre AEE y PBJL y que emitiera sentencia de conformidad.[19] Por ello, plantearon que el desistimiento de la reclamación era contingente a la aprobación de los términos del Acuerdo Transaccional, incluyendo la PPOA con el endoso del Negociado para presentarlos a la JSF. Por consiguiente, solicitaron al Negociado reconsiderar su *Resolución Final y Orden*, suspender el cierre del caso, sujeto a que se presenten conjuntamente los términos revisados por las partes, así como la aclaración de la aprobación del Negociado al acuerdo transaccional, incluyendo el endoso de la PPOA y emitir resolución de conformidad. El 16 de enero de 2025, el Negociado acogió la solicitud de reconsideración[20].

En respuesta, el 4 de abril de 2025, la AEE presentó una Moción Informativa en la que expuso que, en cumplimiento con el Acuerdo Transaccional, la AEE se reunió con su Junta de Gobierno para evaluar el acuerdo transaccional y la propuesta actualizada de

---

[18] *Íd.*, pág. 6.

[19] *Íd.*

[20] El 4 de abril de 2025, el Negociado extendió el término treinta (30) días para resolver la solicitud de reconsideración. Véase, *Resolution,* pág. 8-10 del apéndice del recurso.

la PPOA para el proyecto Montalva. La AEE destacó que la propuesta actualizada de la PPOA presentada por PBJL no era una propuesta actualizada que reflejaba los términos y condiciones pactados en el Acuerdo Transaccional, sino que era una nueva propuesta con precios más elevados. La AEE añadió que la referida propuesta de la PPOA fue rechazada por la Junta de Gobierno de la AEE. Además, expuso que la Junta de Gobierno de la AEE aprobó el Acuerdo Transaccional conforme a los términos y condiciones allí expuestos, mediante *Resolution No. 5162,* y que no se negociaron modificaciones al Acuerdo Transaccional. Señaló, además, que con la presentación de la *Resolution No. 5162I,* el caso ya fue resuelto, por lo cual el Acuerdo Transaccional es vinculante y está en pleno vigor. Por ende, y como parte de sus obligaciones contractuales, la recurrida informó que estaría presentando una PPOA actualizada al Negociado sobre el proyecto Montalva, una vez PBJL le notificara el borrador actualizado de la PPOA que reflejara los términos y condiciones pactados en el Acuerdo Transaccional. Sin embargo, destacó que, a la fecha de presentación de su escrito, PBJL no había cumplido con presentarle el referido borrador actualizado de la PPOA.

El 20 de abril de 2025, PBJL presentó una Moción Informativa en la que le solicitó al Negociado suspender el cierre del caso y ordenar una vista evidenciaria ante un Oficial Examinador.

El 26 de abril de 2025, el Negociado emitió *Resolución* en la que declaró no ha lugar la solicitud de reconsideración y solicitud de vista evidenciaria[21]. En su dictamen, el Negociado expresó que las partes se obligaron voluntariamente a un acuerdo de transacción, el que sirvió de base para el archivo de los procedimientos. Por consiguiente, el Negociado determinó que los

---

[21] Íd.

términos del Acuerdo Transaccional suscrito por las partes son finales, vinculantes y ejecutables. Además, el Negociado aclaró que el Acuerdo Transaccional solo era vinculante en cuanto a la AEE y PBJL y que la anuencia del Negociado a la solicitud de desistimiento de las partes se basó únicamente en el hecho de que estas alcanzaron un acuerdo para finiquitar el caso, por lo que dicha anuencia del Negociado no debía interpretarse como una aprobación de la materia sustantiva del Acuerdo Transaccional o que el Negociado había analizado sus términos. El Negociado puntualizó que su aprobación a la solicitud de desistimiento fue basada únicamente conforme a lo establecido en la Sección 4.03 del Reglamento 8543, sobre las solicitudes de desistimiento[22]. Por lo anterior, el Negociado indicó no estar obligado por el Acuerdo Transaccional de ninguna manera. El Negociado reiteró que el caso estaba cerrado y aclaró que, si AEE y PBJL pretendían proseguir con la implantación del acuerdo en forma de una PPOA, debían presentar la misma para aprobación del Negociado, bajo el Art. 6.32 de la Ley 57-2014[23], de acuerdo con los procedimientos aplicables.

Insatisfecho con el dictamen, PBJL acude ante nos mediante un recurso de revisión administrativa y formuló los siguientes señalamientos de error:

> El Negociado de Energía erró al no dejar sin efecto el desistimiento ni devolver el caso a la Oficina de Examinadores para conceder un plazo adicional que permitiera negociar ciertos términos adicionales al acuerdo transaccional entre las partes.
> El Negociado de Energía erró al no aclarar expresamente si las partes pueden someter un PPOA con términos económicos distintos a los establecidos en el acuerdo de transacción para su aprobación, conforme al Artículo 6.32 de la Ley 57-2014.[24]

---

[22] Reglamento 8543 de 18 de diciembre de 2014.
[23] *Ley de Transformación y ALIVIO Energético*, Ley Núm. 57 de 27 de mayo de 2014 (Ley Núm. 57-2014), 22 LPRA sec. 1051, *et seq.*
[24] QUESTIONS OF LAW
  1. THE BUREAU ERRED IN NOT RESCINDING THE WITHDRAWAL, NOR IN RETURNING THE CASE TO THE OFFICE OF THE EXAMINING OFFICERS AND PROVIDING AND ADDITIONAL TERM TO PROVIDE AN OPORTUNITY TO NEGOTIATE CERTAIN ADDITIONAL TERMS TO THE SETTLEMENT AGREEMENT BETWEEN THE PARTIES.

El 3 de junio de 2025, emitimos *Resolución* en la que concedimos un término al Negociado para elevar copia certificada del expediente administrativo NEPR-QR-2021-0026. El Negociado cumplió con nuestra resolución el 23 de junio de 2025.

El 11 de julio de 2025, la AEE presentó *Alegato de la Autoridad de Energía Eléctrica de Puerto Rico.*

Con el beneficio de la comparecencia de las partes, estamos en posición de resolver.

## II.

### A.

Sabido es que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *Otero Rivera v. Bella Retail Group, Inc. y otros*, 2024 TSPR 70, resuelto el 24 de junio de 2024; *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99 (2023); *OEG v. Martínez Giraud*, 210 DPR 79 (2022); *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). Es por ello, que, tales determinaciones suponen una presunción de legalidad y corrección que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Transporte Sonnell, LLC v. Junta de Subastas de la Autoridad de Carreteras y Transportación de Puerto Rico y otro*, 2024 TSPR 82, resuelto el 24 de julio de 2024; *Otero Rivera v. Bella Retail Group, Inc. y otros*, supra; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma

---

2.    THE BUREAU ERRED BY NOT EXPRESSLY CLARIFYIG WHETHER THE PARTIES MAY SUBMIT A PPOA WITH ECONOMIC TERMS OTHER THAN THOSE SET FORTH IN THE TRANSACTION AGREEMENT FOR APPROVAL, IN ACCORDANCE WITH ARTICLE 6.32 OF LAW 57-2014.

no es absoluta. Es por ello que nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 2024 TSPR 29, 213 DPR ___ (2023).

En *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la siguiente forma:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida. *Íd.* Véase, además, *Voilí Voilá Corp. et al. V. Mun. Guaynabo*, supra, y *Super Asphalt v. AFI y otro*, supra, pág. 819.

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud*, supra; *Super Asphalt v. AFI y otro*, supra, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Torres Rivera v. Policía de PR*, supra, pág. 626. Bajo este criterio, se limita la revisión judicial a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *Íd.*

Bajo este supuesto, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9675 (LPAU), estableció "el marco de revisión judicial de las determinaciones de las agencias administrativas". *Otero Rivera v. Bella Retail Group, Inc. y otros*, supra; *Rolón Martínez v. Supte. Policía*, supra, pág. 35. La intervención del tribunal se

limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.,* págs. 35-36; *OEG v. Martínez Giraud,* supra; *Torres Rivera v. Policía de PR,* supra, págs. 626-627; *Batista, Nobbe v. Jta. Directores,* supra, pág. 217. Nuestro Máximo Foro ha expresado que esta intervención "debe ocurrir cuando la decisión administrativa no se fundamente en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley". *Rolón Martínez v. Supte. Policía,* supra, pág. 36. Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Íd.; OEG v. Martínez Giraud,* supra; *Super Asphalt v. AFI y otro,* supra.

Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675; *Rolón Martínez v. Supte. Policía,* supra, pág. 36; *Torres Rivera v. Policía de PR,* supra, pág. 627. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Íd.*

El Tribunal Supremo de Puerto Rico ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales". *Torres Rivera v. Policía de PR,* supra, págs. 627-628; *OEG v. Martínez Giraud,* supra. Finalmente, nuestra más Alta Curia ha expresado que, conforme a lo anterior, el criterio administrativo no podrá prevalecer en aquellas

instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia". *OEG v. Martínez Giraud*, supra, pág. 11.

**B.**

Mediante la *Ley de Transformación y ALIVIO Energético*, Ley Núm. 57 de 27 de mayo de 2014 (Ley Núm. 57-2014), 22 LPRA sec. 1051, *et seq.*, la Asamblea Legislativa creó el Negociado de Energía de Puerto Rico como un ente independiente especializado encargado de reglamentar, supervisar y hacer cumplir la política pública energética del Gobierno de Puerto Rico. Art. 1.3 (j), 22 LPRA sec. 1051a (j); véase, además, Capítulo VI de la Ley Núm. 57-2014, *Creación, estructura, operación, presupuesto y poderes generales del Negociado de Energía.*

Con el fin de dar cumplimiento a la política pública encomendada, el Negociado promulgó el Reglamento 8543 de 18 de diciembre de 2014, *Reglamento de procedimientos adjudicativos, avisos de incumplimiento, revisión de tarifas e investigaciones*. Esta reglamentación establece las normas que rigen los procedimientos adjudicativos ante el Negociado, a la luz de la LPAU, *supra*. Véase, Sec. 1.03, Reglamento 8543. En lo aquí pertinente, en cuanto a las solicitudes de desistimiento, el Artículo 4.03 del referido reglamento establece lo siguiente:

> A) El querellante o promovente podrá desistir de su querella o recurso mediante:
>
> 1) [...]

2) En cualquier etapa de los procedimientos, mediante estipulación firmada por todas las partes del caso.

B) El desistimiento será sin perjuicio **a menos que el aviso o la estipulación expresare lo contrario.** (Énfasis nuestro).

### C.

Mediante el contrato de transacción, por concesiones recíprocas, las partes ponen fin a su litigio o incertidumbre sobre una relación jurídica. Artículo 1497 de Código Civil de Puerto Rico 2020, 31 LPRA sec. 10641. Los elementos característicos de un contrato de transacción son: "(1) la existencia de una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de eliminar o superar esa controversia; y (3) concesiones recíprocas". *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 903 (2012). Los contratos de transacción se interpretan de manera restrictiva, por lo que al interpretar cuáles son los efectos, se debe establecer primero qué fue lo que se pactó. *Íd.* pág. 904.

Los contratos transaccionales pueden ser judiciales o extrajudiciales. Los contratos transaccionales extrajudiciales son aquellos en donde las partes alcanzan un acuerdo que elimina la controversia al comenzar el pleito o durante el pleito, sin la intervención judicial. *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 730 (2018). Mientras que los contratos transaccionales judiciales son aquellos en los cuales las partes, luego de comenzado el pleito, eliminan la disputa y solicitan incorporar el acuerdo al proceso judicial, teniendo el efecto de culminar el pleito. *Íd.*

La transacción produce el efecto de cosa juzgada, "...pero no procederá la vía de apremio sino tratándose del cumplimiento de la transacción judicial". Artículo 1500 de Código Civil de Puerto Rico 2020, 31 LPRA sec. 10644; *Neca Mortg. Corp. v. A&W Dev. S.E.*, 137 DPR 860, 872. Esto quiere decir que las partes deben considerar los puntos discutidos como definitivamente resueltos, por lo que no

pueden volver nuevamente sobre éstos. *Íd.* Y usualmente la transacción judicial es la única con fuerza para pedir su ejecución como si se tratase de una sentencia firme. *Íd.*

**III.**

Por estar relacionados los señalamientos de error, procederemos a discutirlos en conjunto.

En su recurso, PBJL señala que el Negociado erró al no dejar sin efecto la *Resolución Final y Orden* por desistimiento. Asimismo, sostiene que el Negociado incidió al no devolver el caso a los oficiales examinadores y proveerle a las partes un término para negociar ciertos términos adicionales al Acuerdo Transaccional. Además, afirma que el Negociado incidió al no aclarar de forma expresa si las partes podían o no presentar una PPOA con términos económicos distintos a aquellos expuestos en el Acuerdo Transaccional.

Sabido es que debemos brindarle deferencia a las determinaciones de hechos que esbozan las agencias administrativas. Consecuentemente, nuestra función apelativa queda reducida a revisar que la agencia recurrida actuara dentro del marco de la facultad delegada por las leyes y reglamentos que administra. En otras palabras, la revisión judicial de decisiones administrativas se debe limitar a determinar si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituye un abuso de discreción.

Por otra parte, sabido es que las determinaciones de hecho de las agencias serán sostenidas por el Tribunal si se fundamentan en evidencia sustancial que obre en el expediente administrativo. Por lo tanto, estamos obligados a sostener tales determinaciones si están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad. *Misión Ind. PR v. JCA,* supra; *Fac. C. Soc. Aplicadas, Inc. v. CES*, 133 D.P.R. 521 (1993). En virtud de lo anterior, examinamos el Acuerdo Transaccional por el

cual se emitió la *Resolución Final y Orden* recurrida, así como la totalidad del expediente administrativo. A la luz de lo anterior, resolvemos.

Mediante el Acuerdo Transaccional suscrito entre las partes, PBJL se obligó a honrar el precio propuesto en la PPOA del 20 de julio de 2020, a pesar de las condiciones inflacionarias, y se comprometió, además, a limitar su propuesta de ajuste durante la totalidad del término de la PPOA, sin cargo o derecho monetario. Por consiguiente, PBJL y la AEE acordaron hacer los cambios y ajustes necesarios al borrador de la PPOA del 20 de julio de 2020, de modo que reflejaran los términos y condiciones que pactaron en el Acuerdo Transaccional. De las cláusulas pactadas por PBJL y la AEE surge que la recurrente estaba consciente de los acuerdos a los cuales se obligó. Fue en virtud de lo antes pactado que ambas partes solicitaron que el desistimiento de la querella fuera con perjuicio, y el Negociado así lo acogió.

Sin embargo, PBJL radicó una solicitud de reconsideración de la resolución que dio por terminada la querella. De un examen de la solicitud de reconsideración, se desprende que la recurrente, pretende modificar unilateralmente los términos a los que se obligó en el Acuerdo Transaccional, por motivo de las condiciones inflacionarias. Sin embargo, PBJL acordó honrar los precios pactados en la propuesta del 20 de julio de 2020 a pesar de las condiciones inflacionarias que ahora pretende invocar como justificación para modificar el Acuerdo Transaccional. Salta a la vista que, en la cláusula 12 del acuerdo, PBJL expresamente acordó honrar su propuesta de precio sometida a la AEE el 20 de julio de 2020, a pesar de las condiciones inflacionarias. Ahora, pretende lo contrario. Más aún, bajo el pretexto de cambios en el mercado y el efecto de la inflación, PBJL presentó una PPOA con precios distintos y significativamente elevados que no fueron objeto del acuerdo

transaccional suscrito, lo cual fue rechazado por la Junta de Gobierno de la AEE. Encima, la recurrente incumplió con presentar el borrador de la PPOA con los ajustes y correcciones según fueron pactados. Tan es así, que a la fecha en que la AEE presentó su respuesta a la reconsideración, PBJL no había cumplido con entregar a la recurrida el borrador de la PPOA que reflejara los términos y condiciones del Acuerdo Transaccional.

Fue en virtud del referido Acuerdo Transaccional que las partes pusieron fin al litigio, por lo que el referido acuerdo constituye un contrato vinculante entre PBJL y la AEE. Conforme expusimos anteriormente, un contrato de transacción es un contrato en el que las partes evitan un pleito o ponen fin a un litigio. *Berkan et al. v. Mead Johnson Nutrition,* 204 DPR 183 (2020); *Demeter Int'l. v. Srio. Hacienda,* 199 DPR 706, 729 (2018). Así, luego de evaluar el presente recurso y el expediente administrativo, concluimos que, el referido acuerdo cumple con los elementos necesarios para constituir un contrato de transacción; a saber, la existencia de una relación incierta o litigiosa entre PBJL y la AEE, la intención de las partes de sustituir esa relación incierta o litigiosa por una cierta; y las concesiones recíprocas entre éstas. En vista de lo anterior, el Acuerdo Transaccional por el cual se emitió la *Resolución Final y Orden* por desistimiento, es un contrato de transacción que produce los efectos de cosa juzgada entre las partes. Además, no podemos invalidar dicho acuerdo en virtud de que no se configuran las circunstancias jurídicas que justifiquen su invalidez. Atisbamos que, el invalidar el contrato de transacción atentaría contra el principio de *pacta sunt servanda* y a los términos y a las condiciones contractuales que consintió la AEE.

Así pues, la PBJL está obligada en cumplir con los términos y condiciones suscritos en el Acuerdo de Transacción. Por tanto,

resolvemos que el Acuerdo de Transacción es uno válido y ambas partes tienen la obligación de cumplir con lo pactado.

En resumen, concluimos que el Negociado no cometió los errores señalados por la recurrente. Primero, porque el Acuerdo Transaccional suscrito entre las partes es un contrato de transacción válido que produce los efectos de cosa juzgada. En segundo lugar, nada en el expediente de autos sugiere que el pronunciamiento que atendemos haya resultado en un ejercicio arbitrario atribuible al Negociado. Además, PBJL no presentó evidencia demostrativa de que la actuación del Negociado fuera arbitraria o irrazonable. Tampoco presentó evidencia que demostrara que la determinación de la agencia se apartó del expediente administrativo.

Por todo lo cual, en ausencia de una actuación arbitraria, ilegal, o irrazonable, no intervendremos con la determinación de la agencia. Resolvemos, que la misma es razonable, y está sostenida por evidencia sustancial que obra en el expediente administrativo.

**IV.**

Por los fundamentos antes expuestos, se confirma la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones